## STATE OF CONNECTICUT *v.* JAMES DILLARD
## (AC 20384)

Lavery, C. J., and Landau and Flynn, Js.

Argued March 27—officially released October 16, 2001

*Felix Esposito*, for the appellant (defendant).

*Michael E. O'Hare*, assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence Mariani*, assistant state's attorney, for the appellee (state).

*Opinion*

FLYNN, J. The defendant, James Dillard, appeals from the judgment of conviction, rendered after a jury trial, of burglary in the first degree,[1] conspiracy to commit burglary in the first degree,[2] robbery in the first degree,[3] conspiracy to commit robbery in the first degree[4] and assault in the first degree[5] in connection with a robbery that occurred on May 20, 1998. On appeal, the defendant claims that he was denied a fair trial because of a pattern of prosecutorial misconduct. Although we agree with the defendant that some of the

---

[1] See General Statutes § 53a-101 (a) (1) and (2).

[2] See General Statutes §§ 53a-48 and 53a-101.

[3] See General Statutes § 53a-134 (a) (1) and (3).

[4] See General Statutes §§ 53a-48 and 53a-134.

[5] See General Statutes § 53a-59 (a) (1).

claimed conduct was improper, we conclude that such misconduct did not clearly deprive the defendant of a fair trial. We therefore affirm the judgment of the trial court.

The defendant did not object at trial to any of the alleged prosecutorial misconduct on which his claims are based and therefore requests review of his claims pursuant to *State* v. *Golding,* 213 Conn. 233, 239–40, 567 A.2d 823 (1989).[6] We review the defendant's claims because the record is adequate for our review and because a claim that the defendant's rights to due process and to a fair trial were denied is of constitutional dimension. *State* v. *Radzvilowicz,* 47 Conn. App. 1, 44, 703 A.2d 767, cert. denied, 243 Conn. 955, 704 A.2d 806 (1997).

The defendant identifies seven instances of alleged prosecutorial misconduct in support of his claim. Specifically, the defendant claims that the prosecutor improperly (1) introduced evidence of the codefendants' pleas of guilty during the state's case-in-chief, (2) suggested that the defendant threatened a witness, (3) engaged in a general character assassination of the defendant and the codefendants, (4) suggested that defense counsel acted improperly in representing the defendant, (5) appealed to the passions of the jurors, (6) asked argumentative questions, interjected his personal opinion, misstated evidence and became an unsworn witness for the state in relation to the testimony of a particular witness and (7) commented on the appropri-

[6] Pursuant to *State* v. *Golding,* supra, 213 Conn. 239–40, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

ateness of the codefendants' pleas of guilty during closing argument.

The defendant acknowledges that he cannot prevail on his claims where the challenged conduct was not blatantly egregious and merely consisted of isolated and brief episodes that do not reveal a pattern of conduct repeated throughout the trial. *State* v. *Dumas,* 54 Conn. App. 780, 788, 739 A.2d 1251, cert. denied, 252 Conn. 903, 743 A.2d 616 (1999). The defendant claims, however, that the prosecutor engaged in a pattern of egregious and repeated misconduct not only throughout his case-in-chief but also during closing argument.

In determining whether prosecutorial conduct amounts to a denial of due process, we consider whether the conduct was improper, and, if so, we next determine whether the conduct caused substantial prejudice to the defendant. *State* v. *Cansler,* 54 Conn. App. 819, 828–29 n.9, 738 A.2d 1095 (1999). "We do not focus alone, however, on the conduct of the prosecutor. The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial misconduct." (Internal quotation marks omitted.) *State* v. *Rivera,* 61 Conn. App. 763, 769, 765 A.2d 1240, cert. denied, 256 Conn. 901, 772 A.2d 599 (2001). "To make this determination, we must focus on several factors: (1) the extent to which the misconduct was invited by defense conduct or argument; (2) the severity of the conduct; (3) the frequency of the conduct; (4) the centrality of the misconduct to the critical issues of the case; (5) the strength of the curative instructions adopted; and (6) the strength of the state's case." (Internal quotation marks omitted.) Id., 770.

I

The defendant first argues that during the state's case-in-chief, the prosecutor improperly introduced into evidence the codefendants' pleas of guilty. We disagree.

At trial, the state called as witnesses Lonnie Cross, Harson Griffith and Demetrius White, who, along with the defendant, were charged in connection with the robbery of the victim, Julio Burgos. At the time of trial, each of those witnesses had pleaded guilty to the robbery of Burgos and was incarcerated. Cross, the first to take the witness stand, stated that he was serving a ten year sentence for several robberies, including the robbery of Burgos. Next, Griffith testified that he pleaded guilty to several robberies, including the robbery of Burgos, and that he was serving a ten and one-half year sentence. He denied, however, any knowledge of the robbery of Burgos. White testified last that he also was in jail after pleading guilty to the robbery charge.

"[G]uilty pleas and convictions may be introduced into evidence if the co-conspirator or co-defendant testifies at trial, so that the factfinder will have appropriate facts on hand to assess the witness's credibility. . . . Convictions and guilty pleas generally are not admissible for credibility purposes if the co-conspirator or co-defendant does not testify, and convictions and guilty pleas of co-conspirators and co-defendants other than the witness are not admissible to attack or bolster the witness's credibility." (Citation omitted; internal quotation marks omitted.) *State* v. *Butler*, 55 Conn. App. 502, 511, 739 A.2d 732 (1999), aff'd, 255 Conn. 828, 769 A.2d 697 (2001); see also *State* v. *Just*, 185 Conn. 339, 347–48, 441 A.2d 98 (1981) (whether person jointly charged with crime pleaded guilty not admissible on trial of another person so charged to establish that crime was committed); *State* v. *Pikul*, 150 Conn. 195, 198, 187 A.2d 442 (1962) (same). Within these bounds, we recognized in *State* v. *Cox*, 7 Conn. App. 377, 388, 509 A.2d 36 (1986), that asking a witness on direct examination about his conviction is a permissible tactic to anticipate or soften impeachment evidence. See also *State* v. *Mitchell*, 8

Conn. App. 598, 604, 513 A.2d 1268, cert. denied, 201 Conn. 810, 516 A.2d 887 (1986).

In *Just*, our Supreme Court rejected a claim similar to the defendant's claim in the present case. In that case, the state called three of the defendant's accomplices who had participated in the crimes alleged, and each testified at length on direct and on cross-examination and implicated himself and the defendant. *State* v. *Just*, supra, 185 Conn. 343. Two of the witnesses testified, without objection by the defense, about their convictions of the crimes for which the defendant was on trial. Id., 343–44. The third witness also testified as to his convictions in federal and state court for the certain crimes connected with the incident, to which the defense raised a general objection. Id., 345–46.

The court rejected the defendant's claim that the trial court improperly allowed "the state to prove his guilt by proving the convictions of alleged co-conspirators." (Internal quotation marks omitted.) Id., 343. In doing so, the court reasoned that "[a]ny prejudice resulting from the testimony of the pleas was rendered harmless when the guilt of the accomplices was established by their own testimony which also implicated the defendant." Id., 349. The court further reasoned that "[t]he purpose of the witness' testimony was to give the facts and circumstances of the crime[s]. The testimony as to their pleas of guilty gave the circumstances under which they were testifying, and their status with regard to the charge, and went to their credibility as witnesses for the state." (Internal quotation marks omitted.) Id. The court also noted several other factors that mitigated against finding harm, among which was the absence of any evidence that the state emphasized the witness' guilty pleas during final argument. Id., 350. Additionally, the court noted that defense counsel neither objected to the challenged testimony nor requested a curative instruction, possibly as a matter of trial strategy. Id., 351.

In the present case, evidence of the codefendants' pleas of guilty came from the witnesses' own testimony and was inextricably linked with their testimony and other evidence regarding the circumstances surrounding the robbery of Burgos. Cross testified that at approximately 1 a.m. on May 20, 1998, he, Griffith, White and the defendant went to Burgos' apartment so that Cross could buy drugs and rob Burgos. When the state inquired as to the location of the robbery, Cross replied that it occurred on East Clay Street in Waterbury. The state then called to Cross' attention a statement in evidence that he had given to the police after being arrested.[7] Although Cross professed to having no recollection of providing much of the information in the statement, he did testify that the defendant was present at the scene and drove the vehicle.[8]

---

[7] The statement provided in relevant part that the defendant wanted to rob Burgos, that the robbery occurred on West Clay Street in Waterbury and that the defendant, Griffith and White "pistol whipped" Burgos to get him to tell them where he kept his drugs and money.

[8] In response to the state's questions, Cross testified as follows:

"Q. What did Harson Griffith do inside the apartment?

"A. He was searching around the apartment to see what he could find.

"Q. So Harson was involved in the robbery?

"A. Yeah, he was.

"Q. And how about Demetrius White? What about him, was he involved?

"A. Yes, he was.

"Q. What was Demetrius White doing?

"A. Searching around to find stuff?

"Q. So, it's your testimony that at 1 in the morning you, Demetrius White and Harson Griffith went in and robbed this place and the defendant knew nothing about it?

"A. That's what I said. He ain't knew nothing about it until we ran up in there, you know what I'm saying?

"Q. I don't understand what that means. When did he know about it?

"A. When we kicked in the door. That's when he knew about it, you know what I'm saying?

"Q. And then what did he do when you kicked in the door?

"A. I'm not quite sure because I went directly in there behind him, do you know what I'm saying, to do that—

"Q. You went in behind him?

"A. Yeah, I went in behind the two.

"Q. And then where was [the defendant]?

Griffith testified that he did not know why he was incarcerated but that he was serving a ten and one-half year sentence after pleading guilty under the *Alford* doctrine[9] to several robberies that he did not commit, including the robbery of Burgos in the early morning hours of May 20, 1998. Griffith denied being with the defendant at any time during the day on which Burgos was robbed. Next, White testified that it was Cross' idea to rob Burgos and that he, Cross and the defendant went to Burgos' apartment for that purpose. According to White, the defendant knocked on Burgos' door and entered, with White and Cross following behind. White further testified that as Burgos attempted to escape through a window, the defendant dragged him from the window and that the defendant and Cross "pistol whipped" Burgos with their guns. Considering the witnesses' testimony in its entirety, we conclude that the testimony regarding the witnesses' pleas gave the circumstances under which they were testifying and their status with regard to the charges, and went to their credibility as witnesses for the state. See id., 349.

We further note that, as in *Just*, defense counsel's failure to object to the introduction of the codefendants' guilty pleas or to request a curative instruction, coupled with counsel's cross-examination of two of the three witnesses, mitigates against finding substantial prejudice. Although the defendant waived his right to cross-examine Griffith, his counsel cross-examined both Cross and White, during which each codefendant was

"A. I'm not quite sure. He was in the hallway.

"Q. Who drove the car when you left?

"A. [The defendant]."

[9] See *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). "A defendant who pleads guilty under the *Alford* doctrine does not admit guilt but acknowledges that the state's evidence against him is so strong that he is prepared to accept the entry of a guilty plea." (Internal quotation marks omitted.) *State* v. *Webb*, 62 Conn. App. 805, 807 n.1, 772 A.2d 690 (2001).

questioned on his criminal record, including his plea of guilty to the robbery of Burgos. Last, we note that, although the court did not give a curative instruction; see id., 348–49 ("lack of a curative instruction, especially in the absence of objection and a request for one, does not necessarily constitute harmful error"); the court did provide an instruction on accomplice testimony in its charge to the jury.[10] All of those factors mitigate against a conclusion that the prosecutor engaged in misconduct that substantially prejudiced the defendant when, during the state's case-in-chief, the prosecutor solicited testimony regarding the codefendants' pleas of guilty.

## II

The defendant next claims that during the state's closing argument, the prosecutor improperly suggested that the defendant had intimidated a witness. We agree that this was improper conduct, but in the context of the entire trial, we conclude that it did not substantially prejudice the defendant.

[10] The court charged the jury in relevant part: "Now, there was accomplice testimony in this case. In weighing the testimony of an accomplice who was a self confessed criminal, you should consider that fact. It may be that you would not believe a person who has committed a crime as readily as you would believe a person of good character. In weighing the testimony of an accomplice who has not yet been sentenced or whose case has not been disposed of or who has not been charged with offenses in which the state has evidence, you should keep in mind that he may in his own mind be looking for some favorable treatment in the sentence or disposition of his own case, or hoping not to be arrested. Therefore, he may have such an interest in the outcome of this case that his testimony may have been colored by that fact. Therefore, you must look with particular care at the testimony of an accomplice and scrutinize it very carefully before you accept it. There are many offenses that are of such a character that the only persons capable of giving useful testimony are those who are themselves implicated in the crime. It's for you to decide what credibility you will give to a witness who has admitted his involvement in criminal wrongdoing, whether you will believe or disbelieve the testimony of a person who, by his own admission, has committed or contributed to the crime charged by the state here. Like all questions of credibility, this is a question that you must decide based on the evidence presented to you."

At trial, the defendant called his former girlfriend, Amanda Curtis, as an alibi witness. She testified that the defendant arrived at her home at approximately 11:30 p.m. on May 19, 1998, and remained there until the following morning. She further testified that, although they are no longer romantically involved, she continues to have contact with the defendant because he owns a barber shop where she takes her son.

In commenting on Curtis' testimony during his closing argument, the prosecutor stated that Curtis still takes her son "where [the defendant] is found. [The defendant], who's friends with Lonnie Cross, who's friends with Demetrius White, and who's friends with Harson Griffith. Her son goes there. *And if someone asked you to testify for them and you're the mother of a young child, who knows?*" (Emphasis added.)

"While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or even to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider. . . . We have cautioned repeatedly that a prosecutor should avoid arguments which are calculated to influence the passions or prejudices of the jury, or which would have the effect of diverting the jury's attention from their duty to decide the case on the evidence." (Citation omitted; internal quotation marks omitted.) *State* v. *Pouncey*, 241 Conn. 802, 811, 699 A.2d 901 (1997).

"When presenting closing arguments, as in all facets of a criminal trial, the prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. [A] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury."

(Internal quotation marks omitted.) *State* v. *Rivera*, supra, 61 Conn. App. 769.

Here, the prosecutor's comment, "who knows," in reference to why Curtis, the mother of a young boy, would testify as an alibi witness for the defendant was improper and unprofessional.[11] There was absolutely no evidence in the record from which to suggest that Curtis was testifying under threat, duress or out of fear for her or her son's safety. The prosecutor made such comments despite Curtis' testimony that she wanted to help a friend who was in trouble. We can conclude only that the prosecutor's comment was designed to encourage the jury to speculate, beyond the evidence, as to why Curtis testified on behalf of the defendant. Such conduct is inappropriate.

"Scrutiny of a challenged remark made during closing arguments to the jury [however] does not occur in a vacuum; an appellate court examines such remarks in light of the entire trial." Id., 771. In the present case, we cannot say, as the defendant argues, that the utterance of that comment alone amounted to conduct so egregious that the defendant's conviction must be overturned. We first note that the prosecutor's comment

---

[11] The defendant attached to his brief a computer printout detailing the number of times that the Waterbury Republican-American, a local newspaper, published stories about a Bridgeport criminal action in which a child witness and his mother were murdered. The defendant argues that because such coverage preceded the defendant's trial, the jury likely was exposed to it, and, thus, the prosecutor's comments, which implied that "the defendant would threaten physical violence toward a child in an attempt to influence trial testimony, is especially egregious."

We note that, notwithstanding the defendant's present argument, he neither objected to the prosecutor's comments at trial nor filed a motion to set aside the verdict, a motion for a mistrial or a motion for a new trial based on that argument. See *State* v. *Rivera*, supra, 61 Conn. App. 777 (failure to object to allegedly prejudicial comments at trial often indicates that counsel did not view remarks as so prejudicial that client's right to fair trial was seriously jeopardized). Consequently, that information was not before the trial court, and, on appeal, we do not take new evidence.

was not part of a recurring line of argument. While defense counsel liberally objected to argument, evidence and testimony throughout the trial, including during closing argument, counsel neither objected to nor requested a curative instruction regarding the challenged comment. "The failure to object to certain arguments at trial often is an indication that counsel did not view the remarks as so prejudicial that his client's right to a fair trial was seriously jeopardized. . . . Counsel might make a tactical decision not to object to a marginally objectionable argument because he or she does not want to draw the jury's attention to it or because he or she wants to later refute that argument." (Citation omitted; internal quotation marks omitted.) Id., 777.

The fact that defense counsel squarely addressed Curtis' veracity during his own closing argument also mitigates against concluding that the comment caused substantial prejudice to the defendant.[12] Moreover, defense counsel expressed his own personal opinion as to the truthfulness of that witness. See footnote 12.

---

[12] In his closing argument, defense counsel argued in relevant part that "[o]n the one hand, the state gives you three career criminals in jail all serving sentences, all convicted felons, all admitted liars. On the other hand, you have Amanda Curtis, a nurse's assistant, works, earns a living, never convicted of any crimes, she comes in to testify. . . . And you're asked to think somehow she's lying, that she's the perjurer. It doesn't make any sense. . . . Do you think that if she went to the police, they were just going to say let [the defendant] out of jail; we got his old girlfriend here. That's silly. That's just silly. She called up his lawyer and she told me. She told that to you. Isn't that the rational thing to do? And as we discussed, at the right time she would get to tell her story to the jury and the jury would decide whether or not this woman was a liar.

\* \* \*

"I think, on the other hand, although the defendant has no burden to put any evidence forward, you had testimony from someone who is not part of the system, was not part of the criminal element, who actually told you where [the defendant] was that night, wasn't impeached, no one came in to show that she was lying. And, you know, quite frankly I think that she was as honest as she could be with you."

The strength of the state's case further leads us to conclude that the prosecutor's remark did not improperly influence the jury. Cross, Griffith and White each implicated the defendant in the crimes alleged. White testified at length to the defendant's involvement. Cross' statement to the police, which was admitted into evidence, detailed the defendant's involvement. Burgos also identified the defendant as one of the three men who had robbed him at his apartment. Therefore, although we condemn the prosecutor's comment, we must conclude that, in light of the entire trial, the prosecutor's comment did not cause substantial prejudice to the defendant.

### III

The defendant next argues that the prosecutor attempted to assail the defendant's character "by implying that 'guilty birds of a feather are flocked together.' " First, the defendant argues that the prosecutor improperly engaged in a general character assassination of the defendant and the codefendants by asking Cross on redirect examination whether it is "fair to say that you were running around the city committing crimes for quite some time before this incident happened," and then by immediately asking whether Cross was friends with the defendant for the last four years before his arrest on the night of May 20, 1998. The defendant further contends that the prosecutor continued the general attack during his closing argument.[13]

---

[13] The defendant identified the following comments of the prosecutor during the state's closing argument as egregious: "Then we come to Lonnie Cross. Lonnie Cross is a piece of work, and you'd probably cross the street if you saw him come the other way. But keep in mind that Lonnie Cross is friends with the defendant; he knows him. Picture the four of those people riding around in a car in the south end of Waterbury with guns going to drug dealers' houses. Wouldn't you expect them all to be together? It's not like one of us found yourself in that situation. A bunch of people out to do a bad thing. . . .

\* \* \*

"Let me tell you another thing about people who commit crimes. People who commit crimes by and large are not smart. Lonnie Cross is not smart.

The defendant's claim is without merit. First, the defendant was charged with conspiracy to commit burglary and robbery with Cross, Griffith and White. Therefore, evidence of the defendant's association with them was relevant. Second, the prosecutor's question regarding Cross' criminal activities was within the permissible boundaries of redirect, especially in light of defense counsel's searching cross-examination of Cross' extensive criminal record. We also note that Cross' statement to the police, in which he already had admitted his association with the defendant, was admitted into evidence. Regarding the challenged comments that were made during the state's closing argument, we note that defense counsel engaged in his own "general character assassination" of the codefendants during his closing arguments.[14] For the foregoing reasons, we conclude that the prosecutor's comments do not amount to prosecutorial misconduct.

## IV

The defendant next argues that the prosecutor engaged in misconduct by suggesting that defense coun-

---

Demetrius White is not smart. Neither is Julio Burgos. None of them are. That's why they get caught."

[11] Defense counsel argued in relevant part: "So, you're left with having to trust Lonnie Cross to convict [the defendant]. Lonnie Cross, the career criminal. Do you remember when I went over his record with him? If I held it up in the air, it would have hit the ground if I let it drop. He was proud of it, proud of it. Here's someone since he was the age of sixteen sticking people up, fighting with the cops, selling drugs, and that's the witness. . . .

"The next witness, another person who comes in from jail, Harson Griffith. . . . [T]he state's attorney says he didn't testify, he did testify. He just didn't say what the state wanted him to say, but he did say I didn't do these crimes. . . .

"The next person we heard from who was brought in from jail, Demetrius White. Another stickup kid, another drug dealer out on the streets selling drugs, holding people up. . . . He comes in and testifies against the guy they want. And I'll tell you something, I'll bet you a million dollars. When this case is over, he walks. He gets sentenced and he's gone. He's back out on the street and he's holding people up like you and me, people that work for a living everyday. That's what he's going to do. And that's who the state wants you to trust, that little punk Lonnie Cross, stickup guy, career criminal."

sel acted improperly in his representation of the defendant. This claim also is without merit.

The defendant's claim rests on the prosecutor's following statements made during his closing argument: "I'm afraid that I'm going to give you a little bit of a lecture right now. There are procedures where I can object during a closing argument, when things are inappropriate. And let me ask you this. How inappropriate is it for the defense attorney to stand up and to say that his client is innocent? He's not a witness in this case. Would he be willing to go on the stand under oath and subject himself to cross-examination? *It is as wrong for him to say he knows the defendant is innocent as it would be for me to come up to you and say, you know, I know a lot about this case and he's guilty.* That's inappropriate." (Emphasis added.)

Assuming that those comments may be construed as an attack on defense counsel's representation of the defendant, we must evaluate the prosecutor's comments in light of defense counsel's argument that preceded them. The prosecutor's comments were made immediately following defense counsel's statement that sometimes when he meets somebody in a bar, he informs them that he is a lawyer and that he practices criminal defense. Defense counsel continued: "It's a great way to chill a relationship. So you represent all . . . those guilty people. How can you do that? . . . I tell them . . . [i]t's easy to represent guilty people. It's when you represent the people that you know are not guilty, that's when it's tough. That's when the pressure is on. That's, really, the hardest part of this business. And I would submit to you that based on the record you have here, that [the defendant] is not guilty. Because to find him guilty you'd have to be just as bad as the system, and I don't think you are."

We conclude that, although the prosecutor's comments may have been improper, defense counsel invited

such comments. "Defense counsel, like the prosecutor, must refrain from interjecting personal beliefs into the presentation of his case." *United States* v. *Young*, 470 U.S. 1, 8–9, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985); see also Rules of Professional Conduct 3.4 (lawyer shall not in trial state personal opinion as to justness of cause, credibility of witness or guilt or innocence of accused). Whatever way in which counsel adroitly phrased his comments, counsel did what rule 3.4 prohibits. As we discussed previously, in determining whether the defendant's rights to due process and to a fair trial were violated, our focus is not on the culpability of the prosecutor, but rather on the impact such misconduct had on the fairness of the defendant's trial. *State* v. *Rivera*, supra, 61 Conn. App. 769. We cannot say that the prosecutor's comments greatly affected the defendant's rights, particularly in light of the court's instruction to the jury[15] and the fact that the comments were not repeated.[16]

---

[15] The court instructed the jury in relevant part: "In reaching your verdict, you should consider all the testimony and the exhibits that have come in. Certain things, however, are not evidence and you should not consider them in deciding what the facts are. And the things that aren't evidence include the following. First, the arguments and statements that were made by the lawyers. The lawyers are not witnesses. They've said what they had to say in their closing arguments, and that was intended to help you interpret the evidence but it's not evidence itself. The facts as you remember them are important. And if . . . the facts as you remember them differ from the way the lawyers have stated them, it's your memory that controls. Secondly, the testimony that may have been excluded or stricken, any objections that I sustained, answers that you didn't hear, that is also evidence that you shouldn't take into consideration. I don't recall at any point in time I told you disregard that statement. On occasion, the court sustained objections to evidence and that evidence shouldn't be considered."

[16] We note, in passing, that the defendant's reliance on *United States* v. *McLain*, 823 F.2d 1457 (11th Cir. 1987), overruled in part on other grounds as recognized by *United States* v. *Watson*, 866 F.2d 381, 385 n.3 (11th Cir. 1989), is misplaced. In *McLain*, the court reversed the judgment of conviction where there was significant evidence that, throughout the trial, the prosecutor continuously made critical remarks about the character of the defendant's counsel, including accusations that counsel was misleading witnesses and lying to the jury. *United States* v. *McLain*, supra, 1462. There is no evidence in the present case that the prosecutor engaged in such conduct.

## V

The defendant next argues that the prosecutor improperly appealed to the passions of the jurors. Specifically, the defendant claims that during closing argument, the prosecutor diverted "the jury's attention toward improper notions of its duty to protect society."[17] The defendant further argues that the prosecutor improperly complained "about the failings of the 'system' in general" during his rebuttal closing argument.[18] We are not persuaded by the defendant's claims.

[17] The defendant identifies the following remarks that the prosecutor made during closing argument to support his claim: "This is not Julio Burgos versus the defendant, James Dillard. This is the state of Connecticut against James Dillard. We are all living in a civilization. And what is a civilization? It's where reasonable people obey the law. And if there's a violation of the law, we don't prosecute that violation of the law to protect Julio Burgos. We prosecute that violation of the law to protect civilization, to protect the citizens of this state. We cannot tolerate people dealing with each other like that.

"Remember what Julio Burgos said about why he went and got the shotgun? Because he was afraid because who knows what he was going to do with it. Is that how we're going to let people settle their disputes? We're going to let James Dillard go and pistol whip Julio Burgos with his friends, and then we're going to let Julio Burgos go and buy a shotgun and do whatever he's going to do with that with his friends? That's not how it works. What we do is we arrest people, we accuse them of crimes, we bring them to trial, and we hold them accountable in courtrooms where we don't have fistfights and we don't hit people over the head. We find the truth. We come to ordinary citizens like yourselves and we ask you to make a decision based solely on the facts. Don't come back with a verdict that says I don't like Julio Burgos. . . . Who would? He's a drug dealer. But he was robbed. He was violently robbed, there was a crime committed. [The defendant] needs to be held accountable, and that's where you all step in . . . ."

[18] The defendant identifies the following remarks of the prosecutor made during his rebuttal argument: "That's why our jails are full to capacity. And that's why the state strikes deals with criminals everyday in every court in this country because so many people are out committing crimes. We have to give them great deals. We have to let people go to jail for thirty months when, in a perfect system, they'd be in jail for ten years for their crimes. We don't have the resources.

"When I first started to work here, someone came up to me and they said your job is like trying to push back the ocean with a broom, and that's what it is. We do not have the resources to prosecute everybody. Julio Burgos went to plea on his case. That day I'll bet you throughout this country

We initially note that the defendant neither objected to the challenged comments nor requested a curative instruction. See *State* v. *Banks*, 58 Conn. App. 603, 620, 755 A.2d 279 (where counsel does not object or request curative charge, we presume counsel did not consider remarks as so prejudicial that client's right to fair trial was seriously jeopardized), cert. denied, 254 Conn. 923, 761 A.2d 755 (2000). After reviewing the transcript of the trial court proceedings, we conclude that the prosecutor's statements during closing argument were not improper and, even if they were improper, they were not so egregious as to cause substantial prejudice to the defendant. "In determining whether a prosecutor's conduct was so egregious as to deny a defendant a fair trial, we note that some leeway must be afforded to the advocates in offering arguments to the jury in final argument." (Internal quotation marks omitted.) Id., 619. The prosecutor's comments were part of a wider argument discussing why the jury should care about the case, notwithstanding that the victim was an admitted drug dealer. Furthermore, unlike in *State* v. *Mills*, 57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000), on which the defendant relies,

---

thousands of people went to plea on their case and they got much less time in jail than any reasonable law-abiding person thinks they should get. That is the cold, unhappy truth of how our system works. We don't have the resources to lock these people up for as long as they deserve to be locked up.

\* \* \*

"We're all adults. And we all know that doing the right thing isn't always easy, right? And it might be easy in this case to say who cares about Julio Burgos, who cares about any of these people. To tell you the truth, they deserve each other. That might be easy. But the right thing to do is hard sometimes. And I'm not asking you to just not care about this case and go off and convict [the defendant]. What I'm asking you to do is the right thing. You know from the evidence in this case that [the defendant] was involved in that robbery. You know it. All the witnesses say it. And the right thing to do might be a little bit harder, but it is the right thing and you should do it. And that means convicting the defendant of all the crimes he's charged with. Thank you."

the prosecutor did not express the "opinion that society would be in trouble if the defendant were not found guilty of murder." Id., 207. Rather, the prosecutor was explaining why the jurors should care about the case and not decide the case on the basis of their like or dislike of Burgos, an admitted drug dealer, who defense counsel earlier had urged was a beneficiary of a lax and lenient justice system.

Regarding the prosecutor's comments during his rebuttal closing argument, we note that they immediately followed and were invited by defense counsel's argument about "the system."[19] We cannot say that the

---

[19] In his closing argument, defense counsel argued in relevant part: "I'll tell you something. Really, the government, the power they have, it's scary. It's a scary thing that they can do that to this young drug dealer and put this kind of pressure on him, make this kind of deal with him. But that's the system. That's the system. You know, it's the system that wants you to believe Lonnie Cross, Julio Burgos, Demetrius White, it's the system. And the reason why is because they believe these people over and over again every day; they trust them. So now they want you to trust them. And why do they trust them? Because they come into court and they give them a promise to appear. Do you promise to come back to court? Yeah. You heard what Julio Burgos said. Why didn't you come to court? They threw the case out anyway. They get arrested, they'll nolle their cases. You won't get in trouble again, right? No. They trust them. We'll give you probation. You'll follow the law, right, you can't offend when on probation? Yeah. How many times did Lonnie Cross get probation? I mean, it's a wonder that he hasn't killed anybody. And probation, probation, probation. Why? The system trusts them.

"Now the system wants you to trust their testimony. And I want you to remember these are people—they make a living out of getting over on the system. That's how they make their living, that's how they survive. What I'm asking you to do, what I'm pleading with you to do, is don't let them get over on you and on me. Just because the state and the system lets them do it, that doesn't mean we have to do that, too. I mean, think about it. State isn't using their power and their resources now to help a storekeeper or a homeowner, someone that goes out and earns everyday for a living. They brought all their resources in here against [the defendant] to protect a career criminal or drug dealer, someone who is really poisoning our city little by little everyday.

\* \* \*

"Now, I want you to ask yourself that if this was one of your loved ones, would you be satisfied with this prosecution? If [the defendant] was your

rebuttal comments were improper in light of the parties' respective closing arguments. In so deciding, we are mindful that "[i]n addressing the jury, [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of the argument." (Internal quotation marks omitted.) *State* v. *Banks*, supra, 58 Conn. App. 619.

VI

The defendant next claims that the prosecutor asked argumentative questions, interjected his personal opinions into the case, misstated the evidence and became an unsworn witness for the state. The defendant first contends that "[i]n an attempt to impeach Cross, the prosecutor resorted to improper argumentative questions and interjected his personal opinions into the case."[20] We agree that the expression of the prosecutor's

brother or your son, would you be satisfied with the way things turned out here? I mean, could you live with it? Would it sit right with you? I don't think that it would. I would submit to you that based on the evidence that you've heard in this courtroom and the lack of evidence, that if you go into that room and you come out and you find [the defendant] not guilty on all of these charges, I think that you could be satisfied that you've done the right thing and you can be proud of what you've done because you'd be basing it on the law. And I think when you went home and you explained to people why you found [the defendant] not guilty, then I think whoever you explain that to will be proud and would understand that all you did was follow the law. . . . And I would submit to you that based on the record you have here, that [the defendant] is not guilty. Because to find him guilty you'd have to be just as bad as the system, and I don't think you are. And you'd have to buy into the system's argument that these, you know, gang, bang and stickup kids are the people that you want to believe, that you want to trust . . . and I don't think you can do that."

[20] The defendant's claim rests, in part, on the following colloquy between the prosecutor and Cross:

"A. What was the question?

"Q. Is this amusing to you?

"A. No, you know what I'm saying? You keep asking the same damn questions, you know what I'm saying?

"Q. I'm trying to get you to tell the truth.

"A. I am telling you the truth.

personal opinion as to Cross' veracity was improper.
See *State* v. *Hicks*, 56 Conn. App. 384, 391, 743 A.2d
640 (2000) (prosecutor may not express his own opin-
ion, either directly or indirectly, as to credibility of
witnesses). We cannot say, however, that this isolated
personal opinion rises to a level of substantial prejudice.
This is especially so in light of the defendant's failure
to object to the opinion or to seek a curative instruction.

We decline to review the defendant's additional claim
that the prosecutor misstated Cross' testimony because,
as the defendant acknowledges, the trial court sus-
tained the defendant's objection to the complained of
questioning.[21]

The defendant also contends that the prosecutor mis-
stated Curtis' testimony during closing argument. The
record reveals that, notwithstanding Curtis' testimony
that she contacted defense counsel one week after the
defendant was arrested, the prosecutor stated that Cur-
tis waited until she testified at trial "to bring those facts
to the light of anybody who could help her boyfriend
out." Assuming that the prosecutor intentionally mis-

---

\* \* \*

"Q. And then what did [the defendant] do when you kicked in the door?

"A. I'm not quite sure because I went directly in there behind him, do you know what I'm saying, to do that—

"Q. You went in behind him?

"A. Yeah, I went in behind the two.

"Q. And then where was [the defendant]?

"A. I'm not quite sure. He was in the hallway.

"Q. Who drove the car when you left?

"A. [The defendant].

"Q. So, [the defendant] drove what you would call the getaway car?

"[Defendant's Counsel]: Objection, Judge. That's what he's calling it.

"[The Court]: I'll sustain the objection.

"Q. Is that the car you used to get away in?

"A. Yes.

"Q. And [the defendant] drove that car?

"A. Yes."

[21] See footnote 20.

stated Curtis' testimony, we cannot say that the misstatement substantially prejudiced the defendant.[22]

The defendant further claims that the prosecutor became an unsworn witness for the state when, during his rebuttal argument, he chronicled his efforts to contact Curtis.[23] Specifically, the defendant challenges the prosecutor's use of the word "I" in reciting his office's efforts to communicate with Curtis. We are not persuaded.

Although we agree with the defendant that "[u]ndoubtedly, using the pronoun 'I' in an argument increases the chances that appropriately structured arguments will deteriorate into expressions of personal opinion"; *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 401, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999); there was little, if any, chance of that occurring in the present case. Here, the prosecutor's recitation of his office's efforts to speak with Curtis directly related to Curtis' earlier responses to the state's efforts to speak with her, all of which were before the jury.[24] In light of Curtis' earlier testimony, the

---

[22] We note, in passing, that in *State* v. *Watson*, 47 Conn. App. 794, 798–800, 707 A.2d 1278 (1998), aff'd, 251 Conn. 220, 740 A.2d 832 (1999), we held that the trial court properly allowed the state to cross-examine the defendant's alibi witness concerning her failure to report his alibi to law enforcement, notwithstanding her testimony that she had told defense counsel.

[23] During rebuttal argument, the prosecutor stated in relevant part: "Amanda Curtis was made known to the state for the first time on September the 8th of 1999. As soon as I heard her name, I sent inspectors out to her address. I sent inspector John Maia. There was testimony about that. He left a business card on her door. She did not call. I sent inspector Vincent Paolino. He left the card on her door. She did not call. I had the inspector talk to her neighbors and ask her to call us, and she didn't call. She was in court. I asked her to talk to me. She said no. She was in court. I had inspector Solomita ask her to talk to us, and she said no."

[24] On cross-examination, Curtis testified in relevant part as follows:

"Q. And you knew that you had the perfect alibi for him, he was with you all night long, right?

"A. Well, he was with me, yes.

"Q. And you kept that to yourself while he sat in jail?

"A. Yes.

jury reasonably could have inferred that the prosecuting attorney directed the efforts of the inspectors in the present case. Moreover, the "[u]se of the personal pro-

"Q. Did you think it would be a good idea to go and tell someone at the police department?

"A. No.

"Q. Did you think it would be a good idea to go and tell somebody at the state's attorney's office?

"A. No, I just wanted to—oh, no, I just spoke to attorney Crone.

\* \* \*

"Q. And you didn't have any concern about the fact that he was sitting in jail? You didn't think maybe you could help him get out of jail by going and telling the truth?

"A. Well, I wanted the jury to hear, you know, I talked to attorney Crone.

"Q. So you decided to wait until this trial came along—

"A. Yes.

\* \* \*

"Q. And while he was in jail, you didn't do anything to help get him out, right?

"A. No.

\* \* \*

"Q. And did you go to the state's attorney's office and tell us that this person was being wrongfully held in jail?

"A. Just attorney Crone, that's it.

"Q. So you never came and told us?

"A. No.

\* \* \*

"Q. Isn't it true that about four of five different times over the last week or so you found business cards from the state's attorney's office stuck into your door?

"A. Yes, I did.

"Q. Requesting that you call our office?

"A. Yeah.

"Q. And didn't inspector Solomita, who's sitting right here, ask you earlier today to come and talk to us and tell us what you knew?

"A. Yes.

"Q. Didn't I in fact ask you to come and to tell us what you knew about this case?

"A. Yes.

"Q. And you decided not to talk with us?

"A. Yes.

"Q. Any time?

"A. Yes.

"Q. And how many times—how many notes did you find from inspectors from the state's attorney's office on your door?

"A. Two.

noun I is a normal and ordinary use of the English language. If courts were to ban the use of it, prosecutors would indulge in even more legalese than the average lawyer, sounding even more stilted and unnatural." (Internal quotation marks omitted.) Id., 400. After reviewing the record, we conclude that these comments were not improper.

## VII

The defendant's last claim is that the prosecutor improperly commented on the appropriateness of Cross' and White's guilty pleas, thereby burdening the defendant's right to elect a jury trial.[25] The defendant

"Q. Two separate occasions?

"A. Yes.

"Q. And did your neighbors tell you that somebody was out there looking for you?

"A. Yes.

"Q. And did you make any efforts to call our office?

"A. No.

"Q. Were there phone numbers on those business cards?

"A. Yeah.

"Q. Did you know where the state's attorney's office was if you needed to talk to us?

"A. Well, it was on the card. It was.

"Q. And I think actually you got a card from inspector Paolino also. Not only inspector Maia and inspector Solomita, but also inspector Paolino left a card for you too, didn't he?

"A. Well, I only received two, so I don't know who—"

[25] The defendant assigns error to the following comments made by the prosecutor during closing argument. "And Lonnie Cross is in jail right now for having pled guilty to that crime [the robbery of Burgos]. What else could be more of an admission about the fact that he knows about the crime? Not only did he give the statement to the police, but then instead of going to trial he pled guilty. He admitted his responsibility.

* * *

"And then we come to Demetrius White. I think you could tell that he was kind of the youngest of the group. He pled guilty to the crime, has known [the defendant] for his entire life. And I asked him do you have anything against [the defendant], do you have any reason to be trying to get him in trouble, and he said no. He said if you do the crime, you got to do the time. It's a pretty sophisticated attitude for somebody who, I think, said he was coming up on nineteen years old. . . . He pled guilty, he put the case behind him."

solely relies on *State* v. *Jones*, 734 So. 2d 670 (La. App. 1999), in support of his claim. In that case, the court overturned the defendant's conviction of theft on the ground that the prosecutor's rebuttal comments that "[t]he problem is that this self-confessed liar [a codefendant who testified for the state at trial] took responsibility for what he did and pled guilty. [The defendant] does not want to take responsibility for his actions"; (internal quotation marks omitted) id., 671–72; violated the presumption of the defendant's innocence under the Louisiana and federal constitutions. The Louisiana court reasoned that the prosecutor's comments led the jury "to infer that because . . . the defendant . . . did not want to take responsibility for his actions, as did . . . the co-defendant . . . [the defendant] did not plead guilty." Id., 672.

Although "improper use of a co-conspirator's conviction infringes on the principle that the central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence"; (internal quotation marks omitted) *State* v. *Butler*, supra, 55 Conn. App. 513; such use in the present case was not improper. Here, the prosecutor did not compare Cross' and White's guilty pleas with the defendant's plea, but rather used their guilty pleas as evidence of their credibility as witnesses. Moreover, the jury already was aware of Cross' and White's pleas in connection with the robbery of Burgos as each testified thereto, and defense counsel cross-examined each witness about his extensive criminal records, including their respective guilty pleas. See id., 511 (coconspirator's guilty plea and conviction may be introduced into evidence if coconspirator testifies at trial, so that fact finder will have appropriate facts to assess witness' credibility). When viewed in the context of the entire trial, we cannot say that these comments substantially prejudiced the defendant. See *State* v. *Lucas*, 63 Conn. App. 263, 277, 775 A.2d 338 (individ-

ual comments not scrutinized in vacuum, but are reviewed in context of entire trial), cert. denied, 256 Conn. 930, 776 A.2d 1148 (2001). Another factor mitigating against a conclusion of substantial prejudice is that defense counsel neither objected to nor requested a curative instruction. See *State* v. *Banks*, supra, 58 Conn. App. 620. We conclude, therefore, that these comments were not improper.

We conclude, in light of the foregoing determinations, that the defendant has failed to demonstrate that the prosecutor engaged in a pattern of misconduct so egregious that the defendant's right to a fair trial was violated. For those same reasons, we conclude that the defendant's claims do not satisfy the third condition under *Golding*.

The judgment is affirmed.

In this opinion the other judges concurred.