STATE OF CONNECTICUT *v.* MAURICE BLACKWELL
(AC 25178)

Dranginis, McLachlan and Dupont, Js.

Argued September 21—officially released December 14, 2004

*Pamela S. Nagy*, special public defender, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *John A. Connelly*, state's attorney, and, on the brief, *Terence Mariani*, assistant state's attorney, for the appellee (state).

*Opinion*

McLACHLAN, J. The defendant, Maurice Blackwell, appeals from the judgment of conviction, rendered after a jury trial, of the murder[1] of Alonta Gaymon. He claims that (1) the court improperly denied his motion to suppress evidence of an eyewitness identification and (2) prosecutorial misconduct deprived him of a fair trial. The defendant argues, in the alternative, that this court should exercise its inherent supervisory authority and reverse the judgment of conviction. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On the afternoon of August 24, 2000, the defendant and a friend, Jonathan Pierre, drove to Waterbury, where Pierre was to begin attending college in the fall. After driving around Waterbury for some time, the two stopped at a convenience store. Rather than enter the store, the defendant walked away, leaving Pierre waiting in his car. The defendant eventually walked along Grove Street and sat on the front steps of an apartment building. Gaymon sat on the front steps of the apartment building directly across the street at 261 Grove Street, facing the defendant and another unidentified man. The victim was joined by a friend and tenant of 261 Grove Street, Cassandra Norris, and Norris' friend, Robert

---

[1] The defendant was convicted of violating General Statutes § 53a-54a (a), which provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

McClary. The defendant acknowledged the victim with a wink, but the two did not speak to one another.[2]

After approximately ten minutes, the defendant stood up and walked across the street. He stopped within two feet of the victim and Norris, and pulled a double-barreled sawed-off shotgun out of his jacket. Norris ran around the side of the building and heard the victim plead with the defendant, "Please don't kill me, please don't kill me." By the time Norris reached the back of the building, she heard a gunshot. The defendant shot the victim in the back of her head as she attempted to run away. When the defendant pulled out the shotgun, McClary retreated into the building's front entranceway. The victim also retreated into the entranceway, hiding behind McClary and grabbing him for protection. The victim pleaded with the defendant by name,[3] begging him not to shoot her. The defendant ordered McClary to move out of the way. McClary obliged to avoid being shot, forcing the victim's hands off of him, and he ran out of the building. As McClary ran away from the building, he heard a gunshot. He looked back and saw the victim fall to the ground.

Shortly thereafter, Pierre drove along Grove Street, looking for the defendant. Pierre saw the victim lying

[2] The defendant's former girlfriend, Nosadee Sampson, testified that the defendant and the victim knew one another, and that the defendant had robbed the victim previously. In July, 2000, the defendant and Sampson spent a weekend with the victim, during which time the three attempted to sell drugs. When the victim refused to give the defendant and Sampson a ride home, the defendant robbed and choked the victim, stole her car and left her tied up in her apartment. The prosecution theorized that the defendant's motive for killing the victim was that the victim had reported the robbery to the police and that the defendant killed the victim so that she could not testify against him. The court allowed the jury to consider Sampson's testimony regarding the robbery only for the purpose of showing the defendant's motive.

[3] McClary testified that the victim used the defendant's nickname, "Moe," when pleading for her life. Several of the witnesses testified that the defendant was known as Moe.

in a pool of blood. Continuing past the crime scene, Pierre turned onto the next block, where the defendant got into the back of the moving car and commanded Pierre to drive away. Pierre saw that the defendant had a shotgun and that he wiped the gun and cartridges with his sleeve to eliminate fingerprints while Pierre drove. The defendant also removed the spent cartridges from the shotgun, wiped them off and threw them out the window as he and Pierre proceeded along Route 8. The defendant told Pierre, "I think she's dead. I think I got her. I'll be mad if she's not dead. I don't even feel like I did it." Pierre drove the defendant to Bridgeport. Later that night, Ericka Carlson, an acquaintance of the defendant and friend of the victim, encountered the defendant in the lobby of her apartment building. She noticed approximately ten inches of a gun's barrel protruding from inside his denim jacket.

Police arrived shortly after the shooting and spoke to witnesses. Norris accompanied the police to the police station, where police presented her with an array of photographs matching the description she gave of the killer. Police included the defendant in the photographic array because he was a suspect in the July, 2000 robbery of the victim. Norris identified the defendant as the shooter. McClary, after viewing a photographic array, also identified the defendant as the shooter. Police arrested the defendant on a warrant shortly thereafter. A forensic DNA test revealed that human tissue found on the defendant's denim pants, recovered during the execution of a search warrant, came from the victim. The victim died from a single shotgun wound to the back of her head. The defendant was convicted of murder, and the court sentenced him to a term of sixty years imprisonment. Additional facts will be set forth as necessary to address the defendant's specific claims on appeal.

I

The defendant first claims that the identifications made by Norris, who identified him from a photographic array as the shooter and in court during trial, were improperly allowed into evidence in violation of his right to due process. Specifically, he argues that Norris' recognition of other men pictured in the array rendered her identification of the defendant unnecessarily suggestive and unreliable.

"To determine whether a pretrial identification procedure, such as the photographic array in this case, violated a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on an examination of the totality of the circumstances. . . . An identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . The defendant bears the burden of proving both that the identification procedures were unnecessarily suggestive and that the resulting identification was unreliable." (Citations omitted; internal quotation marks omitted.) *State* v. *White*, 229 Conn. 125, 161–62, 640 A.2d 572 (1994).

Norris spoke to police when they arrived at the scene of the shooting and accompanied them to the police station to give a statement. Police presented Norris with a photographic array that pictured eight young men fitting the shooter's general description. Norris identified photograph number eight, the defendant, as the man who had crossed Grove Street and pulled a shotgun from his jacket. Norris told police that she had ample opportunity to view the defendant because it was day-

light and he approached to within two feet of her. Norris also told police, when asked, that she recognized three other men pictured in the array. She did not know any of them well or even by name, but simply recognized their faces.

The defendant claims that the fact that Norris recognized the faces of three other men in the photographic array rendered her identification of him inadmissible. He argues that although the police could not have known that Norris would recognize three of the men, once that fact came to their attention, they should have taken measures to change the identification procedure, "such as requiring Norris to wait another day to view a different array." The defendant also argues that the identification was inadmissible because it was made by process of elimination.

In response, the state argues that to remove the three photographs of men Norris recognized and to conduct a new photographic array would have made the identification suggestive with respect to the remaining five photographs. Furthermore, to require Norris to wait one day or more to make the identification would have weakened the reliability of the identification, as her memory only hours after the shooting was presumably still fresh. We agree with the state.

The identification procedure police used with Norris did not give rise to a substantial likelihood of irreparable misidentification. The defendant does not claim that the photographic array was unnecessarily suggestive on its face and concedes that the eight men pictured looked substantially similar. Furthermore, the police could not have known that Norris would recognize any of the men pictured in the array. Once the police became aware of that fact, they questioned Norris about how she knew the men, and she told them that she did not know them, but only recognized them as men she had

seen while living in Waterbury. She positively identified the defendant as the man who walked across Grove Street and pulled the shotgun from inside his jacket. Satisfied with Norris' identification of the defendant, the police took no curative measures to ensure its admissibility.

We are not persuaded that the police should have taken further action by either replacing the three photographs or by requiring a second photographic array the next day. We also are not persuaded that Norris' recognizing three men other than the defendant helped her eliminate them, as Norris never testified that she eliminated the three men she recognized on that basis. Rather, she focused on the defendant, whom she recognized as the shooter. Moreover, we are not persuaded, given all of Norris' testimony, that she selected the defendant's photograph by process of elimination. We conclude, therefore, that the fact that Norris recognized the faces of three of the men pictured in the photographic array did not alone create an unnecessarily suggestive identification procedure.

Even if we assume arguendo that Norris' recognition of three men in the photographic array rendered it unnecessarily suggestive, the identification was nonetheless reliable under all of the circumstances. "The reliability of an identification procedure is considered under various factors, such as the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation." (Internal quotation marks omitted.) *State* v. *Thompson*, 81 Conn. App. 264, 270, 839 A.2d 622 (2003), cert. denied, 268 Conn. 915, 847 A.2d 312 (2004). As previously noted, Norris had ample opportunity to view the defendant, who sat across the street from her for ten minutes and then

approached to within two feet of her. Norris testified that her degree of attention was very high, given the extraordinary event she was witnessing. Her description of the defendant was consistent with the photograph she selected from the array, and remained consistent throughout the aftermath of the shooting and the trial proceedings. Norris maintained a high level of certainty, both immediately after the shooting and during the trial. In addition, Norris identified the defendant shortly after the shooting when her recollection was most reliable. We accordingly conclude that the court properly allowed into evidence testimony concerning the Norris identification.

## II

The defendant next claims that the prosecutor engaged in misconduct that deprived the defendant of a fair trial. Specifically, the defendant claims that the prosecutor stated his personal opinion of the credibility of witnesses and of the defendant's guilt, and injected extraneous material into the trial.

We review the defendant's unpreserved claims in accordance with our Supreme Court's recent decision in State v. Stevenson, 269 Conn. 563, 849 A.2d 626 (2004). "[T]he touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by [our Supreme Court] in State v. Williams, 204 Conn. 523, 540, 529 A.2d 653 (1987). As [the Supreme Court] stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct

. . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 573.

"Regardless of whether the defendant has objected to an incident of misconduct, a reviewing court must apply the *Williams* factors to the entire trial, because there is no way to determine whether the defendant was deprived of his right to a fair trial unless the misconduct is viewed in light of the entire trial. . . . Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves." (Citation omitted.) Id., 573–74.

## A

Before we can apply the *Williams* factors, we first must determine whether any prosecutorial misconduct in fact occurred. *State* v. *Coney*, 266 Conn. 787, 808, 835 A.2d 977 (2003). The defendant claims that there were several instances of prosecutorial misconduct. In his brief, he separates them into two categories, and we shall do the same. He claims that the prosecutor committed misconduct by (1) stating his opinion of the veracity of witnesses and the guilt of the defendant, and (2) becoming an unsworn witness and injecting extraneous matters into the trial.

## 1

We first address the defendant's claims that the prosecutor injected his opinion into the trial. The law in that

area is well settled. "The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 713, 793 A.2d 226 (2002). "However, [i]t is not improper for the prosecutor to comment upon the evidence presented at trial and to argue the inferences that the jurors might draw therefrom . . . . We must give the jury the credit of being able to differentiate between argument on the evidence and attempts to persuade them to draw inferences in the state's favor, on one hand, and improper unsworn testimony, with the suggestion of secret knowledge, on the other hand. The state's attorney should not be put in the rhetorical straitjacket of always using the passive voice, or continually emphasizing that he [or she] is simply saying I submit to you that this is what the evidence shows, or the like." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 583–84.

We address each claimed instance of prosecutorial misconduct in turn. During the prosecutor's closing argument, and again during his rebuttal closing argument, the prosecutor repeatedly stated that this was "a straightforward case." For example, in the beginning of the prosecutor's closing argument, he stated, "And as I sat and thought about it in this case—and this is a very straightforward case—what I worry about is that you will think that there is something more, you know,

everybody watches TV and you see movies and, you know, there's a great compelling moment in the trial or some surprise ending. This is just a—it's a straightforward case. What you see is what you get. There's no big surprise ending, nothing's going to happen out of thin air that just makes everybody jump out of their seat. So, what I hope from you is that you don't make this into more than it is. I mean, you've heard the evidence. It's a very straightforward case." Another example the defendant cites is the prosecutor's discussion of Pierre's testimony that the defendant got into Pierre's car and admitted that he shot the victim. The prosecutor stated, "That's why I don't want you to speculate or dream things up or, you know, look for the second shooter on the grassy knoll. [Pierre] came in and told you what happened. It's that straightforward."

We find that the prosecutor was inside the bounds of appropriate rhetoric. Although there was certainly an element of opinion in those statements, there was no danger that the jury would be led to speculate about the possible existence of other evidence that was not presented at trial. To the contrary, the prosecutor was telling the jury that there was nothing more to the case and that the jury should not speculate about evidence that was not presented in court. The prosecutor's statements in that regard were not improper.

During rebuttal closing argument, after the defense had argued during its closing argument that Pierre may have been more than an innocent bystander and was perhaps the unidentified man sitting with the defendant on the steps immediately before the shooting, the prosecutor made the following remarks. "I really don't understand that argument. I don't. I've tried to. He—maybe Pierre was the second person who walked up to the stoop. Maybe he was involved in the murder. Okay. Believe that if you want to. What does that say? He should have been arrested. He's guilty, too." The defen-

dant claims that those statements to the jury implied the prosecutor's opinion that the defendant was guilty. We agree.

The prosecutor did commit misconduct when he stated his opinion that Pierre may have been "guilty, too." That comment was an indirect statement of opinion that the defendant was guilty. That is misconduct, however minor it may be in this context.

The defendant also claims that the prosecutor impermissibly opined that the state's witnesses were credible. About Pierre, he asked rhetorically, "And what more reliable person to come in and say what had happened? This wasn't a confession given to police officers, these were words between friends." He commented about Norris and McClary, "who by my account and, I would submit by the account of the evidence, had nothing to gain in this case, no motive to do anything but to tell what they remember."

The prosecutor's statements did not rise to the level of misconduct. "While a prosecutor may not interject personal opinion about the credibility or truthfulness of a witness, he may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial. . . . Undoubtedly, using the pronoun "I" in an argument increases the chances that appropriately structured arguments will deteriorate into expressions of personal opinion. Prosecutors should be circumspect and artful in designing their arguments to avoid having a jury misinterpret such remarks as improper expressions of personal opinion." (Citations omitted.) *Jenkins* v. *Commissioner of Correction*, 52 Conn. App. 385, 401, 726 A.2d 657, cert. denied, 249 Conn. 920, 733 A.2d 233 (1999). In the present case, although the prosecutor may have been slightly careless in his use of the first person singular, we do not agree with the defendant

that the prosecutor's comments were expressions of personal opinions of the witnesses' credibility. The prosecutor did not personally guarantee the witnesses' credibility or imply that he had knowledge of the witnesses' credibility that was obtained outside of the record. See id.

2

We next address the defendant's claim that the prosecutor committed misconduct by becoming an unsworn witness and injecting extraneous matters into the trial. "A prosecutor . . . may not . . . inject extraneous issues into the case that divert the jury from its duty to decide the case on the evidence." (Internal quotation marks omitted.) *State* v. *Santiago*, 269 Conn. 726, 735, 850 A.2d 199 (2004). "A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . [A] lawyer shall not . . . [a]ssert his personal knowledge of the facts in issue, except when testifying as a witness. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Internal quotation marks omitted.) *State* v. *Williams*, 81 Conn. App. 1, 13, 838 A.2d 214, cert. denied, 268 Conn. 904, 845 A.2d 409 (2004).

The defendant claims that during the direct examination of McClary, the prosecutor improperly insinuated that McClary was lying when he testified that he did not remember who committed the shooting or the name the victim used in reference to the shooter. The defendant also claims that the prosecutor improperly suggested that he, himself, had had a private conversation with McClary one week before trial during which McClary remembered the shooting in detail.[4]

---

[4] The following exchange with McClary occurred on redirect examination by the prosecutor:

"[The Prosecutor]: How—how long ago was it you spoke to [a state's inspector] and myself about this case?

"[The Witness]: Last week, I think.

Although the prosecutor's questioning of McClary may have suggested to the jury that the prosecutor personally knew that McClary remembered the shooting but refused to testify truthfully about his recollections, the court sustained the defense objection to that line of questioning on the basis of form. Furthermore, the prosecutor thereafter succeeded in entering into evidence as a past recollection recorded the statement implicating the defendant that McClary gave to police the week after the shooting. We conclude, therefore, that the prosecutor did not commit misconduct in his questioning of McClary.

Next, the defendant claims that the prosecutor improperly injected extraneous matter into the case when he stated in rebuttal closing argument: "Nobody wants to be involved. You think these people come in here willing to testify? Oh, I had a great day. I saw a murder. I can do my civic duty, I can make sure a guilty man gets punished. These people run away. They don't want anything to do with it because they are afraid." Also, referring only to McClary, the prosecutor stated, "And why do you think that Robert McClary doesn't want to go back to jail, which we all know is where he came from because he testified to it. Being someone who came into a murder trial and identified the shooter. Use your common sense. You think it's a good thing to have going on in prison. Hey, everybody, I'm back from court. Did what I should. I stood up and made sure that the truth came out at trial. Too bad that somebody got convicted, but you all understand, you know, I had to do the right thing. Please."

"[The Prosecutor]: And it's fair to say, isn't it, that you had a clear recollection of it a week ago, isn't it?"

The defense objected, and the court sustained the objection as to the form of the question. We note that the information the prosecutor attempted to elicit could have been entered into evidence properly had the question been formed properly.

The defendant claims that those remarks, when taken to their logical conclusion, suggest that the defendant was incarcerated and that he or his friends would harm witnesses if they implicated the defendant. The state, on the other hand, argues that the statements represent a reasonable explanation of the witnesses' reluctance to testify. Although we find that those remarks could be interpreted as improper, we conclude that they amounted to reasonable explanations of the witnesses' reluctance to testify candidly and were not thinly veiled references to the danger of retaliation faced by the state's witnesses.

The defendant also claims that the prosecutor's remarks in closing argument about blood spatter evidence injected into the trial extraneous material that was not in evidence. The defense theorized that given the blood spatter evidence left at the crime scene, the shooter's clothing would have been covered with blood. The defense noted, however, that only a small amount of the victim's blood was recovered from the defendant's suit. In response, the prosecutor argued that the evidence did not suggest that the shooter would be covered with blood.

After reviewing the record, we conclude that the prosecutor's remarks about blood spatter evidence were an appropriate argument interpreting the evidence. The defense argued that the shooter would have been covered with blood, and the prosecution countered that the evidence did not support that conclusion. The record amply supports the prosecution's argument and, therefore, the prosecutor's remarks in that regard did not constitute misconduct.

Finally, the defendant claims that it was improper for the prosecutor to comment during rebuttal closing argument about the Norris identification to the effect that the police had "put together a photo array that

[was] perfectly appropriate." The defendant argues that the legal propriety of the Norris identification was not a matter for the jury's consideration. We disagree.

The prosecutor's remark did not constitute misconduct. When placed in its appropriate context, it was an argument to the jury in response to the argument made by the defense that the jury should not place any weight on the Norris identification. The prosecution was entitled to respond to that argument put forth by the defendant.

B

As discussed, there was a single, nonegregious instance of prosecutorial misconduct in this case. After applying the *Williams* factors, we conclude that the incident of misconduct was isolated and that the effect on the jury could not possibly have been severe. Moreover, the evidence of the defendant's guilt was overwhelming and included two eyewitnesses, the defendant's admission to Pierre and the recovery of the victim's DNA from human tissue found on the defendant's clothing. "[I]solated instances of nonegregious misconduct will not warrant reversal." *State* v. *Warholic*, 84 Conn. App. 767, 785, 854 A.2d 1145, cert. granted on other grounds, 271 Conn. 935, 861 A.2d 512 (2004). Accordingly, we conclude that the single instance of prosecutorial misconduct in this case did not deprive the defendant of a fair trial.

III

The defendant's final claim is that, although we have concluded that prosecutorial misconduct did not deny him a fair trial, we should nonetheless reverse his conviction under our inherent supervisory powers. See *State* v. *Payne*, 260 Conn. 446, 450–53, 797 A.2d 1088 (2002) (appellate courts have power to reverse defendant's conviction under supervisory powers in interest

of justice even when prosecutorial misconduct does not deprive defendant of fair trial). We decline the defendant's invitation to take that drastic step. The single instance of prosecutorial misconduct does not approach the level of misconduct necessary for us to engage in the *Payne* analysis.

The judgment is affirmed.

In this opinion the other judges concurred.