STATE OF CONNECTICUT *v.* VICTOR SANTIAGO
(AC 34699)

Robinson, Alvord and Sheldon, Js.

Argued January 14—officially released May 28, 2013

*Katherine C. Essington,* assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue,* assistant state's attorney, with whom were *Terence D. Mariani, Jr.,* senior assistant state's attorney, and, on the brief, *Maureen Platt,* state's attorney, for the appellee (state).

*Opinion*

SHELDON, J. The defendant, Victor Santiago, appeals from his conviction of felony murder in violation of General Statutes § 53a-54c and murder in violation of General Statutes § 53a-54a, claiming that he was

deprived of his due process right to a fair trial due to improper comments made by the prosecutor, Terence D. Mariani, Jr., during his closing and rebuttal arguments to the jury.[1] He also asks this court to invoke its inherent supervisory authority over the administration of justice to reverse his conviction in light of Mariani's improper comments made during his closing argument to the jury and his deliberate pattern of making such comments in numerous other cases. Because we conclude that Mariani has engaged in a deliberate pattern of improper conduct in this case and others, and he remains undeterred by pronouncements by this court and our Supreme Court that his conduct was improper, we believe that nothing short of reversal will have the effect of deterring him. We thus reverse the defendant's judgment of conviction and remand the case for a new trial.[2]

The following factual and procedural history provides context for our analysis of the defendant's claims on appeal. In April, 1998, Wilfred Morales owned a bar, the Morales Café, which was located on Baldwin Street in Bridgeport. After closing the bar in the early morning hours of April 11, 1998, Morales left the bar with a blue bank bag containing the cash and checks received from the bar's patrons the previous day. At approximately 2:30 a.m. on April 11, 1998, Morales was shot and killed

---

[1] The defendant also claims that the trial court improperly permitted the introduction of certain evidence of uncharged misconduct into evidence and improperly allowed his wife's statement to the police to be admitted into evidence and read to the jury in its entirety. Because we reverse the defendant's conviction on other grounds, we need not address these claims.

[2] Because we exercise our inherent supervisory authority to reverse the judgment of conviction and order a new trial to deter prosecutorial impropriety that has been unduly offensive to the maintenance of a sound judicial process, we do not undertake an analysis of whether Mariani's improper comments violated the defendant's due process rights. See *State* v. *Ubaldi*, 190 Conn. 559, 462 A.2d 1001, cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983).

in the street near his home on Middle Street in Bridge-port. The defendant was ultimately charged with the murder of Morales.

The state's chief witness in its prosecution of the defendant was the defendant's estranged wife, Damaris Algarin-Santiago (Algarin). Algarin testified that she had been in a relationship with the defendant for sixteen years, beginning when she was in the eighth grade; that they had gotten married in 2004 so that she "couldn't testify against him"; and that they had four children together. She stated that, in the course of her relationship with the defendant, she had come to fear him because he was physically and verbally abusive, he had threatened her and he was a member and the onetime president of the Latin Kings street gang.

The defendant had two brothers, Thomas Bonilla and Noel Bermudez. Algarin testified that Bonilla was released from prison on April 10, 1998, which was a cause for celebration because it was "the first time in a long time [that] . . . these [three] brothers were . . . out [of prison] at the same time." At approximately 8 p.m., the defendant and his brothers went out to cele-brate, while Algarin stayed home and later went to sleep.

In the early morning hours of April 11, 1998, at approximately 3 a.m., Algarin was awakened by the defendant yelling for her to come downstairs. Algarin testified that, when she entered the living room down-stairs, she saw cash, checks and a blue bank bag on the coffee table, which the defendant and Bonilla were sorting through. Algarin testified that Bermudez was in the kitchen taking apart a gun. Bonilla threatened to kill Algarin and her mother if she said anything about what she was seeing or hearing. Algarin testified that Bermudez told her that he shot Morales because he

thought that he had a gun and because Morales previously had shot the defendant.

Algarin explained that the defendant and his brothers next proceeded to destroy the evidence. First, they burned the checks and the bank bag in the kitchen sink. Then they burned the black clothes, which they had been wearing, in a metal bin in the backyard, and put the remaining debris and ashes from that bin and the kitchen sink into a garbage bag which the defendant threw into a dumpster. Algarin testified that Bonilla and Bermudez went to clean any gun residue from the vehicle that they had used the previous night, while the defendant wiped the pieces of the gun with a towel and baby oil to get rid of the fingerprints. The defendant then put the pieces of the gun into three separate bags and took Algarin with him to dispose of them. Algarin recalled that the defendant threw the first bag in the dumpster across the street from their house; the second bag into another dumpster down the hill from where they lived; and the third bag into a river that was near a car wash. The defendant forced Algarin to go with him to dispose of the pieces of the gun so that she would not be able to "snitch" on him. Algarin testified that, while they were in the car, she again asked the defendant about the murder. He told her that he had been stalking Morales because he and his brothers needed money to start selling drugs; that Bermudez and Bonilla had waited in the bushes for Morales while he waited in the car; and that Bermudez had shot Morales.

When they all returned to the house, the defendant and his brothers began formulating an alibi. They instructed Algarin to tell the police that they were celebrating Bonilla's release from prison and, because April 10, 1998, had fallen on Good Friday, they had all gone to their mother's house to eat fish. Algarin agreed to go along with the alibi. Algarin testified that she deposited the $3000 cash that had been in Morales' bank bag

into her bank account in three increments, using three different ATM machines. When the deposits cleared a day or two later, Algarin withdrew the money for the defendant and his brothers.

Algarin stuck to her story for the next twelve years, despite repeated questioning by the police. In 2009, however, Algarin began dating a man with whom she shared her knowledge about Morales' murder. In April, 2010, when that man had some legal troubles of his own, he told the police what Algarin had told him about Morales' murder. When confronted by the police, Algarin finally admitted that the defendant and his brothers had killed Morales and told the police everything she knew regarding the murder.

The defendant thereafter was charged with murder in violation of General Statutes §§ 53a-8 and 53a-54a (a), murder in violation of § 53a-54a (a) and felony murder in violation of § 53a-54c. The jury found the defendant not guilty of murder in violation of §§ 53a-8 and 53a-54a (a). The jury found the defendant guilty of both murder in violation of § 53a-54a (a) and felony murder in violation of § 53a-54c. The court merged the conviction of murder into the conviction of felony murder and sentenced the defendant to a term of sixty years incarceration. This appeal followed. Additional facts will be set forth as necessary.

The defendant claims that Mariani made several improper comments during his closing and rebuttal arguments to the jury, which deprived him of his constitutional right to a fair trial. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as

the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. . . .

"It is well established, furthermore, that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276 Conn. 633, 744–46, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

"[I]t is axiomatic that a prosecutor may not advance an argument that is intended solely to appeal to the jurors' emotions and to evoke sympathy for the victim or outrage at the defendant. . . . An appeal to emotions, passions, or prejudices improperly diverts the jury's attention away from the facts and makes it more difficult for it to decide the case on the evidence in the record. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis

of powerful and irrelevant factors which are likely to skew that appraisal. . . . An improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . or a plea for sympathy for the victim or her family." (Citations omitted; internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 59, 975 A.2d 660 (2009).

The defendant's claims of impropriety are confined to comments made by Mariani during his closing and rebuttal arguments to the jury. The state concedes that several of Mariani's comments were improper, but defends the propriety of his other comments. We thus begin by addressing each claim of impropriety separately.

I

ALLEGED IMPROPRIETIES IN THIS CASE

A

The defendant first claims that Mariani attempted to appeal to the jurors' emotions by repeatedly referring to the defendant's involvement with a gang despite the fact that the court had admitted evidence of the defendant's gang involvement for the limited purpose of showing Algarin's fear, which, under the state's theory, explained Algarin's failure to reveal to police what she knew about Morales' murder for twelve years.

Prior to trial, the state had filed a notice of intent to offer evidence of uncharged misconduct on the part of the defendant, including violence toward Algarin, his drug dealing activities and his gang membership. In response, the defendant filed a motion in limine to exclude evidence of the defendant's domestic violence and his and his brothers' membership in the Latin Kings. The defendant also filed a separate motion in limine seeking to exclude any reference to his gang membership on the basis that such evidence was irrelevant and

prejudicial and was an attempt by the state to engender sympathy for Algarin. Following a hearing on these motions on October 28, 2010, the court ruled that evidence of the defendant's gang affiliation would not be allowed because its probative value was outweighed by prejudice to the defendant.[3]

At trial, during cross-examination by defense counsel, Algarin indicated that she was afraid of the defendant and his brothers, particularly Bonilla. Defense counsel asked her if she felt as though the defendant still posed a threat to her even though he and his brothers were incarcerated. Algarin responded affirmatively, explaining that the defendant was a Latin King. Upon hearing that testimony, the court excused the jury to again discuss with counsel the issue of evidence of the defendant's gang involvement. Finding that defense counsel had opened the door to that evidence, the court allowed the witness' answer to stand, but agreed to give the jury a limiting instruction that they could consider Algarin's reference to the Latin Kings only in relation to her claimed fear of the defendant while he was incarcerated and not for any other reason. On redirect examination, Algarin testified that, after telling the police about Morales' murder, she left her home in Waterbury and has not been back since. She explained that she feared the defendant because he was a member of the Latin Kings, that he had been the president of the Latin Kings in 1996, and that the Latin Kings are "very dangerous" and "have killed a lot of people."

The defendant claims that Mariani improperly referred to his gang involvement, in that he (1) twice referred to the defendant as a "gang banger"; (2) used the defendant's membership in a gang to attack his

---

[3] The court also precluded the defendant's drug related activity, but determined that the evidence of domestic violence between the defendant and Algarin was admissible due to its materiality relative to Algarin's failure to report the defendant's involvement in the killing of Morales for several years.

character and suggest that he was a violent person generally, stating, "It's not as if [Algarin] finally decided that she was going to get rid of her abusive gang-banging husband"; (3) referred to the defendant and his two brothers as "gangsters," remarking, "these three gangsters hadn't been out of jail together in four years until April 10, 1998. That's the day the gang was all back together"; and stated that the defendant and his brothers "were in and out of jail more than most of us go to the—the grocery store"; (4) asked the jury during his rebuttal closing: "Do you think . . . Algarin, you know, with her gang-banging husband, her kids, everybody in and out of jail, is spending a lot of time reading the Waterbury newspaper . . . ?"; and (5) reminded the jurors two more times that the defendant was a member and president of the Latin Kings. The defendant claims that Mariani's repeated references to him as a gang member amounted to "name calling and character assassination" and constituted an attempt to portray him as a violent and dangerous person.

The state concedes that all of these comments were improper because the court had limited the evidence of the defendant's gang affiliation solely for the purpose of explaining Algarin's fear of her husband. Mariani's comments were thus made in direct contravention of the court's order. See *State* v. *Ubaldi*, 190 Conn. 559, 575, 462 A.2d 1001 ("[w]here a prosecutor in argument interjects remarks deliberately intended to undermine the rulings of the trial court to the prejudice of the defendant, his conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal"), cert. denied, 464 U.S. 916, 104 S. Ct. 280, 78 L. Ed. 2d 259 (1983). This, moreover, is not the first time that Mariani has disregarded a court's ruling in arguing to the jury. In *State* v. *Ortiz*, 280 Conn. 686, 911 A.2d 1055 (2006), the court concluded that Mariani had

improperly contravened the trial court's preclusion of evidence of the guilty plea of one Angel Mundo, a coconspirator, by continuing to seek admission of that guilty plea before the jury.

In addition to flouting the court's ruling limiting the evidence of the defendant's gang involvement, Mariani's repeated references to the gang involvement and his inexplicable attacks on Algarin and the children she shares with the defendant can only be seen as an attempt to stigmatize the defendant, and thereby appeal to the emotions of the jury.[4] As noted, "[a]n improper appeal to the jurors' emotions can take the form of a personal attack on the defendant's character . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Long,* supra, 293 Conn. 59; see also *State* v. *Santiago,* 269 Conn. 726, 755–56, 850 A.2d 199 (2004) (although defendant's nickname, "Danger," was in evidence, prosecutor's use of nickname eighteen times during closing argument was improper appeal to jury's passions, emotions and prejudices); *State* v. *Alexander,* 254 Conn. 290, 300–308, 755 A.2d 868 (2000) (by categorizing interactions between "vulnerable . . . small, weak, naive" victim and "bigger, stronger, more experienced" defendant as "David and Goliath" relationship, prosecutor improperly sought to elicit powerful feelings of disgust for defendant in average juror [internal quotation marks omitted]); *State* v. *Williams,* 204 Conn. 523, 546–47, 529 A.2d 653 (1987) (improper appeal to emotions of jury may arise from state's use of personal and degrading epithets to describe defendant; prosecutor

---

[4] We further note that Mariani's comments not only were improper in a legal sense, but they were also rude and irrelevant to any of the issues in the case. In fact, Mariani's negative comments as to Algarin's lifestyle and her children were ill-advised because his case against the defendant relied heavily on her testimony. Those comments demonstrate a palpable feeling of disdain for all of the individuals involved in this case, a sentiment that has no place in our court system.

impermissibly referred to defendant in closing argument and cross-examination as "drunken bum," "drunk who uses cocaine and smokes marijuana and beats children," "coward," "hiding like a dog," "stupid," and "evil man" [internal quotation marks omitted]); *State* v. *Couture*, 194 Conn. 530, 562, 482 A.2d 300 (1984) ("[i]t is no part of a district attorney's duty, and it is not his right, to stigmatize a defendant"), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State* v. *Alvarez*, 95 Conn. App. 539, 551, 897 A.2d 669 (prosecutor's reference to defendant as " 'junkie' " was improper appeal to emotions of jury because term is pejorative, downgrading and disparaging), cert. denied, 279 Conn. 910, 902 A.2d 1069 (2006).

It cannot reasonably be disputed that Mariani knew or should have known that his repeated references to the defendant's gang involvement would be construed as an improper appeal to the jury's emotions in an attempt to distract the members of the jury from the evidence of the offenses with which the defendant was charged and to have the jury decide the case at hand on the basis of the defendant's involvement with the Latin Kings.

B

During his closing argument to the jury, Mariani also stated: "And the first thing I'm gonna do is tell you that this case reminded me of why I became a prosecutor. You know, we're here, all of us, to seek the administration of justice, and that's what this case is about. And every once in a while a case comes along that reminds me of how important this job is. And this is one of those cases. Because what happens? I mean, the beautiful thing about this case is that for twelve years—for twelve years the defendant got away with murder. And here we are, this jury able to reach back in time and hold him responsible for what he did. That's what my

job is about, and that's what your function is about, to make people pay for the wrongs that they've done." Mariani further argued: "[W]hen the police do their job and when witnesses find the courage to step forward and say what they know, we can reach back, not a month, a year, or five years even, we can reach back twelve years and make him pay for what he did, and that's what this case is about." The defendant argues: "[Mariani's] statements that this case reminded him of why he became a prosecutor, and stressing the importance of this case versus other cases, implied to the jury that he personally believed in [the defendant's] guilt." The state concedes that these remarks were improper, in that Mariani should not have attempted to align the office of the prosecutor with the role of the jury. We agree.

Mariani made similar comments in *State* v. *Bermudez*, 274 Conn. 581, 597, 876 A.2d 1162 (2005), which were found to be improper by our Supreme Court in 2005, five years before this case was tried in 2010. In *Bermudez*, Mariani told the jury: "I tried a lot of criminal cases, and I've stood in front of a lot of juries and I've asked a lot of juries to convict a lot of people and they have." (Internal quotation marks omitted.) Id. The court found that Mariani's comment was improper, concluding: "By referring to his experience prosecuting cases and convincing juries to convict defendants, [Mariani] improperly sought to have the jury trust his judgment and analysis of the evidence as previous juries had. It is for the jury, however, not the state's attorney, to decide if there is reasonable doubt as to the defendant's guilt." Id., 598–99. Here, as in *Bermudez*, Mariani improperly expressed his personal opinion and stressed to the jury the importance of this case to his career and to the administration of justice in an attempt to appeal to the emotions of the jury and to have the jurors

decide the case before them on the basis of something other than the evidence.

## C

The defendant further claims that Mariani improperly appealed to the emotions of the jurors by urging them to decide the case based upon sympathy for the victim and the victim's family. Mariani argued that "your verdict should speak for Mr. Morales. Your verdict should shout out for justice for him and his family. It's the defendant, the defendant sitting there, who put in motion the plan that resulted in Mr. Morales being shot through the heart on his doorstep while his wife was asleep inside." Mariani further argued to the jury: "[W]e throw around words like the body and talk about the body laying in the road, [but] he was a man who was shot and killed. There are sons who lost a father and there's a wife who lost a husband. Don't—lose sight of that because of this sterile environment." Finally, Mariani told the jury: "[I]f you don't feel sad for Freddy Morales, you're not human, right; he didn't deserve to be shot and killed." The state argues that these comments were not improper. We disagree.

It is worth repeating that "[a] prosecutor may not appeal to the emotions, passions and prejudices of the jurors. . . . We have stated that such appeals should be avoided because they have the effect of diverting the jury's attention from their duty to decide the case on the evidence. . . . When the prosecutor appeals to emotions, he invites the jury to decide the case, not according to a rational appraisal of the evidence, but on the basis of powerful and irrelevant factors which are likely to skew that appraisal." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, supra, 204 Conn. 545–46.

Mariani's comments are similar to the prosecutor's improper appeal to a jury's emotions in *State* v. *Mills*,

57 Conn. App. 202, 748 A.2d 318, cert. denied, 253 Conn. 914, 915, 754 A.2d 163 (2000), where the Appellate Court ordered a new trial because of prosecutorial impropriety. The prosecutor in *Mills* stated that the state and the victim wanted justice and justice required a conviction for murder, the victim was not going to be a nameless, faceless, slab of meat on an autopsy table, and the victim could not come to court to tell his story. Id., 209–11, 210 n.14.

Mariani's comments are also similar to those made by the prosecutor in *State* v. *Payne*, 260 Conn. 446, 797 A.2d 1988 (2002), which were found to be improper by our Supreme Court, and constituted a basis for reversing the felony murder conviction in that case. In *Payne*, the prosecutor stated: "Ask yourselves, is that what our law is all about here? Are victims of crime going to have to continually defend themselves, their family, their friends from the grave? Because we all know that is impossible. [The victim] doesn't deserve to be treated like that in life or in death. His name [besmirched, his family besmirched] mudslinging. He can't defend himself. And the defendant, the defendant knows that. That's why we heard the stories we did. All his family has left is his picture. Now on a slab, on a cutting board. Let them have, let them, let his family come away from this trial with one good thing out of it. They heard a lot of negative things in this trial, a lot of accusations that have not been proven against him, his friends, his family. Let them come away with one positive thing. Let them have a memory of [the victim] that they can go back home with. Let them come away with a guilty verdict against the person that put a twenty-five caliber bullet into his body." (Internal quotation marks omitted.) Id., 461–62. The court determined that "the prosecutor's statement . . . was a direct and unabashed appeal to the jury to find the defendant guilty out of sympathy for the victim and his family. The

prosecutor indicated that only a guilty verdict would protect our legal system. Moreover, the description of the victim 'on a slab, on a cutting board' was calculated to inflame the passions of the jury against the defendant as much as to engender sympathy for the victim and his family." Id., 463.[5] Likewise, Mariani's comments constituted an improper appeal to the jury's emotions.

## D

The defendant claims that Mariani improperly referred to facts not in evidence in his rebuttal closing argument. Ralph Crozier, an attorney who previously had represented the defendant and his family, as well as members of Algarin's family, testified at trial on behalf of the state. Crozier testified that approximately ten months after Morales' murder, Algarin came to see him and told him that she was in fear for her life because she had knowledge about the murder. Crozier testified

[5] In *State* v. *Lepri*, 56 Conn. App. 403, 743 A.2d 626, cert. denied, 253 Conn. 902, 753 A.2d 938 (2000), the defendant alleged several claims of impropriety on the part of Mariani. Because those claims were unpreserved, this court did not make a determination as to whether they were improper. It is noteworthy that one of the claimed improprieties by Mariani was comments as to why he became a prosecutor: "I want to thank [defense counsel] because he did something during his argument—he reminded me why I became a lawyer. You can get somebody born in Fairfield, who practices law in Bridgeport, you can get the former chief of adjudications in the motor vehicle department, you can go to Kentucky and get a twenty year [judge advocate general] attorney, but in this courtroom the word of a twelve year old boy is enough to push them out of the room. The first case I ever tried was in Kendrick Avenue and it was a horrible courthouse. There were linoleum floors, the carpet was all torn up, but when I walked in I realized why I wanted to be a trial attorney and why I wanted to be a prosecutor—because a twelve year old boy can come in here and out in the street people might not believe him—someone who spent fourteen years at the motor vehicle department might think that when he is out there he can take advantage of him because there is nobody looking out for him, but when he comes here that's where I—and that's where the state is. And we are not going to let this little boy be abused by that man and hire three attorneys." (Internal quotation marks omitted.) Id., 415–16. The trial court admonished Mariani to "[m]ove the argument away from the personalization of counsel." (Internal quotation marks omitted.) Id., 416.

that Algarin told him that she had seen the defendant and his brothers destroying the evidence of the crime and that they had forced her to take the money that they had stolen from Morales and deposit it into her bank account.

The defendant takes issue with Mariani's reference to Crozier's testimony, in which he told the jury: "Crozier's a man [who has] dedicated his life to defending people accused of crimes. That's what he does. So, don't think that he comes in here lightly and points a finger over at the defendant that may very well land him with a guilty conviction for murder." The defendant claims that there was no evidence presented to the jury that criminal defense work was a substantial part of Crozier's practice, and thus that Mariani's statement amounted to unsworn testimony on his part. The state disagrees, asserting that evidence was presented to support the inference that Crozier was a criminal defense attorney. Such evidence, it argues, included testimony that Crozier had represented the defendant in civil and criminal matters, and had represented members of both Algarin's and the defendant's families in such matters. We agree with the state that sufficient evidence was adduced at trial to support the inference that Crozier had done a great deal of criminal defense work, and thus that Mariani's comments to that effect were not improper.

## II

### MARIANI'S IMPROPRIETIES IN OTHER CASES

Mariani's improper comments in the present case were serious and deliberate. It cannot reasonably be disputed that Mariani, a seasoned prosecutor, knew or should have known of the extensive case law governing the proper bounds of argument and that his comments to the jury in this case exceeded those bounds and were thus improper. In fact, Mariani previously has ventured

beyond those bounds in making similar comments in other cases, which this court and our Supreme Court have found to be improper and he has thus engaged in a deliberate pattern of improper conduct.

Before examining Mariani's pattern of impropriety, we reiterate: "A great deal is at stake in a criminal trial. The interests involved go beyond the private interests at stake in the ordinary civil case. They involve significant public interests. . . . [T]he criminal jury trial has a role in protecting not only the liberty of the accused, but also the entire citizenry from overzealous or overreaching state authority. *Duncan* v. *Louisiana*, 391 U.S. 145, 156, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968)." *State* v. *Patterson*, 230 Conn. 385, 398, 645 A.2d 535 (1994), on appeal after remand, 236 Conn. 561, 674 A.2d 416 (1996). "When presenting closing arguments, as in all facets of a criminal trial, the prosecutor, as a representative of the state, has a duty of fairness that exceeds that of other advocates. [A] prosecutor is not an ordinary advocate. His [or her] duty is to see that justice is done and to refrain from improper methods calculated to produce prejudice and wrongful decisions by the jury. . . . The prosecutor here appeared ready to shelve this solemn duty in favor of lesser gains." (Citation omitted; internal quotation marks omitted.) *State* v. *Moore*, 69 Conn. App. 117, 130, 795 A.2d 563, cert. denied, 260 Conn. 941, 835 A.2d 59 (2002). Not only did Mariani shelve that duty in this case, but he has done so repeatedly.

As we will discuss, this case is not the first in which Mariani has disregarded a trial court's ruling. Mariani's repeated references to the defendant's gang involvement here despite the trial court's ruling limiting the consideration of that evidence to a very limited purpose is similar to his disregard of the trial court's ruling precluding evidence of a plea deal of a coconspirator in *State* v. *Ortiz*, supra, 280 Conn. 686.

Mariani also has repeatedly made improper comments to juries by interjecting his personal opinion and attempting to appeal to their emotions. In *State* v. *Heredia*, 253 Conn. 543, 754 A.2d 114 (2000), Mariani argued to the jury: "If I loaded that gun and shut out the lights in this courtroom and put it in [the defendant's] hand, I think everybody would have a very different perception of how dangerous he is." (Internal quotation marks omitted.) Id., 565. The court concluded that, in so stating, Mariani "went beyond the bounds of proper argument, by improperly evoking feelings of fear on the part of the jurors." Id.

In *State* v. *Dillard*, 66 Conn. App. 238, 784 A.2d 387, cert. denied, 258 Conn. 943, 786 A.2d 431 (2001), this court concluded that, during Mariani's closing argument, he improperly suggested that the defendant intimidated an alibi witness into testifying on his behalf. This court determined that Mariani's "comment was designed to encourage the jury to speculate, beyond the evidence, as to why [the witness had] testified . . . ." Id., 248. This court also concluded in *Dillard* that Mariani had improperly expressed his personal opinion as to the veracity of the testimony of one of the witnesses. Id., 257–58.[6]

In *State* v. *Moore*, supra, 69 Conn. App. 125, this court determined that Mariani improperly attempted to bolster the victim's credibility by downplaying the victim's arrest record, "calling it a 'minor thing' that 'certainly wasn't a felony.' " This court held that, in so stating, Mariani referred to facts not in evidence. Mariani also told the jury that the defendant's half sister "held [the victim's] head as he was lying there bleeding." (Internal quotation marks omitted.) Id., 126. This court concluded

---

[6] We note that the defendant raised other claims of impropriety by Mariani in *Dillard*, but the propriety of those claims was never specifically decided; rather, those claims were rejected as not having prejudiced the defendant.

that the evidence did not support that statement and that it was also an improper attempt to appeal to the jury's emotions and passions.

In *State* v. *Blackwell*, 86 Conn. App. 409, 861 A.2d 548 (2004), cert. denied, 272 Conn. 922, 867 A.2d 838 (2005), this court concluded that Mariani's statement during closing argument that a friend of the defendant who was present near the scene of the murder at issue in that case may have been "guilty, too," constituted an improper statement of his personal opinion that the defendant was guilty. Id., 421.

In *State* v. *Bermudez*, supra, 274 Conn. 581, in addition to determining that Mariani had improperly personalized his argument by stressing the importance of the case to his career, which we have noted previously in this opinion, the court concluded that Mariani improperly attempted to appeal to the emotions of the jury by stating that justice would have been better served if the defendant had died instead of the victims. Id., 597.

In *State* v. *Warholic*, 278 Conn. 354, 897 A.2d 569 (2006), which involved the sexual assault of a child, Mariani commented: "The evidence proves that [the defendant] is the child molester that he's accused of being. They're out there. They're among us." (Internal quotation marks omitted.) Id., 374–75. Mariani also referred to the victim in that case as a " 'cute little kid' . . . ." Id., 375. The Supreme Court found that both of those comments were improper appeals to the jury's emotions and that the latter comment was also an improper interjection before the jury of Mariani's personal opinion as to the physical appearance of the young victim before the jury. Id., 377.

The pattern of improper conduct in which Mariani has engaged can only be seen as a deliberate disregard for the previous determinations of this court and our

Supreme Court.[7] Mariani knew or should have known that his comments exceeded the proper bounds of argument, and the similarity of the statements that he made here to those that previously were deemed improper by this court or our Supreme Court indicates that the misconduct was deliberate. Mariani's misconduct was typical of a larger pattern of misconduct that is not likely to be corrected absent extreme measures. In *State* v. *Payne*, supra, 260 Conn. 446, in which our Supreme Court reversed a felony murder conviction on the basis of prosecutorial misconduct, the court held: "This experienced prosecutor flagrantly violated a rule that is so basic we can only conclude it was deliberate. Such deliberate appeals to juror sympathy cannot, and will not, be countenanced." Id., 463. We echo that sentiment here.

## III

## APPROPRIATENESS OF NEW TRIAL

Having determined that Mariani has engaged in repeated deliberate misconduct, we must determine whether we should invoke our supervisory authority over the administration of justice and reverse the defendant's conviction.

"As an appellate court, we possess an inherent supervisory authority over the administration of justice. . . . The standards that we set under this supervisory authority are not satisfied [merely] by observance of those minimal historic safeguards for securing trial by reason which are summarized as due process of law . . . . Rather, the standards are flexible and are to be determined in the interests of justice. . . . Of course, our

---

[7] Most recently, in *State* v. *Jordan*, 135 Conn. App. 635, 663, 42 A.3d 457, cert. granted, 305 Conn. 918, 47 A.3d 388 (2012), this court determined that Mariani improperly failed to take steps to correct false testimony from two state's witnesses that they did not have plea agreements with the state.

supervisory authority is not a form of free-floating justice, untethered to legal principle. . . . Thus, [e]ven a sensible and efficient use of the supervisory power . . . is invalid if it conflicts with constitutional or statutory provisions. . . .

"[W]hen prosecutorial misconduct is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . *State* v. *Pouncey*, [241 Conn. 802, 811–12, 699 A.2d 901 (1997)]. In *Pouncey*, we previously have recognized that reversal is appropriate when there has been a pattern of misconduct across trials, not just within an individual trial. Id., 815–16 (noting that the defendant does not claim either that the assistant state's attorney in this case previously has used racially charged rhetoric in her arguments to other juries and concluding that [i]f such a pattern or practice of misconduct were discernible . . . reversal of the defendant's conviction would serve the important purpose of demonstrating that such conduct cannot, and will not, be tolerated).

"Accordingly, we exercise our supervisory authority in this context to redress repeated and deliberate misconduct by a prosecutor seeking to increase the likelihood of conviction even though that conduct does not necessarily require reversal as a due process violation. In accordance with the cases cited previously, we pay particular attention to the fact that the prosecutor knew or should have known that the conduct was improper and was part of a pattern of similar misconduct in other cases. We exercise our supervisory authority in order to protect the rights of defendants and to maintain standards among prosecutors throughout the judicial system rather than to redress the unfairness of a particular trial. We do so in order to send a strong message that

such conduct will not be tolerated." (Citations omitted; internal quotation marks omitted). *State* v. *Payne*, supra, 260 Conn. 450–52.

"[O]ur determination of whether reversal is warranted requires us to balance society's interest in maintaining a justice system that treats all defendants fairly and *appears* to do so, against some of the difficulties that might arise in a new trial, including the extent of prejudice to the defendant; the emotional trauma to the victims or others likely to result from reliving their experiences at a new trial; the practical problems of memory loss and unavailability of witnesses after much time has elapsed; and the availability of other sanctions for such misconduct." (Emphasis in original; internal quotation marks omitted.) Id., 463–64.

We begin by noting that "improper statements during closing arguments may have a profoundly serious effect because they are [a]mong the final words of persuasion the jury [hears] before deliberation . . . ." (Internal quotation marks omitted.) Id., 464. It cannot reasonably be doubted that Mariani's comments, either taken alone or cumulatively, prejudiced the defendant. Mariani's repeated references to the defendant's gang involvement and lifestyle increased the possibility that the defendant was convicted for being a member and past president of the Latin Kings, and perhaps for other crimes that might be stereotypically associated with being a member of a street gang. Mariani's explanation to the jury that it was his job and its function "to make people pay for the wrongs that they've done," when considered in the context of the defendant's gang involvement, may have led the jury to believe that the defendant was on trial not only for his role in murdering Morales, but also for his activity as a gang member.

The second, and most difficult, factor that we must consider is the emotional trauma to the victim's family

caused by going through a new trial. Of course, the experience of going through another trial is going to be traumatic for the victim's family. And the state's primary witness, the defendant's wife, is also going to have to face and attempt to overcome her fear of the defendant in testifying against him again. In light of Mariani's pattern of deliberate improprieties, however, the emotional impact to those involved in the trial does not outweigh the need to ensure the fair administration of justice.

The possibility of memory loss and the unavailability of witnesses also do not outweigh our reasons for reversing the judgment of conviction. Twelve years had passed between Morales' murder and the time at which Algarin disclosed her knowledge regarding that murder to the police. It is not likely that Algarin's memory has been seriously impaired since the 2010 trial in this case.

We must finally consider the availability of other sanctions. "We have stated that reversal of a conviction under our supervisory authority generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. . . . Some tribunals have declined to use such supervisory power on the theory that society should not bear the burden of a new trial because of prosecutorial [impropriety] where a new trial is not constitutionally mandated. . . . According to some authorities, the evil of overzealous prosecutors is more appropriately combatted through contempt sanctions, disciplinary boards or other means. . . . This court, however, has long been of the view that it is ultimately responsible for the enforcement of court rules in prosecutorial misconduct cases. . . . Upsetting a criminal conviction is a drastic step, but it is the only feasible deterrent to flagrant prosecutorial misconduct in defiance of a trial court ruling. We are mindful of the sage admonition that appellate rebuke without

reversal ignores the reality of the adversary system of justice. The deprecatory words we use in our opinions . . . are purely ceremonial. Government counsel, employing such tactics, are the kind who, eager to win victories, will gladly pay the small price of a ritualistic verbal spanking. The practice of [verbal criticism without judicial action]—recalling the bitter tear shed by the Walrus as he ate the oysters—breeds a deplorably cynical attitude towards the judiciary. . . . Merely to reprimand a prosecutor who disregards the authority of a trial court and engages in deliberate conduct that undermines the fairness of a trial would not sufficiently convey our strong disapproval of such tactics." (Citations omitted; internal quotation marks omitted). *State* v. *Payne*, supra, 260 Conn. 465–66.

Mariani made several improper comments in this case, a felony murder case, and, in so doing, jeopardized the constitutionality of the trial proceedings. More troublesome, however, is his repeated and deliberate use of improper argument throughout other cases. Despite the fact that this court and our Supreme Court have repeatedly determined that Mariani has exceeded the bounds of proper conduct, he continues to do so. We thus conclude, as our Supreme Court did in *Payne*, that "nothing short of reversal will deter similar misconduct in the future." Id., 466.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.