******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.* VICTOR SANTIAGO
(AC 41228)

Sheldon, Prescott and Bear, Js.

*Syllabus*

Convicted of the crime of murder in connection with the shooting death of the victim, the defendant appealed. *Held*:

1. The trial court did not abuse its discretion in admitting a certain written statement by the defendant's wife as a prior consistent statement under the applicable provision (§ 6-11 [b] [1]) of the Connecticut Code of Evidence; the written statement was offered following cross-examination of the defendant's wife, during which her credibility was challenged using multiple prior inconsistent statements, and, thus, it was admissible to rehabilitate her credibility under § 6-11 (b) (1), which requires that the credibility of a witness first be impeached by an inconsistent statement before the consistent statement can be admitted as an exhibit.

2. The trial court did not abuse its discretion in admitting, as relevant evidence, the testimony of the defendant's wife concerning uncharged misconduct involving specific instances of domestic violence by the defendant: that evidence was probative to explain why the defendant's wife feared the defendant and waited twelve years before telling the police about her knowledge of the victim's murder, and was material to corroborating crucial prosecution testimony, as it made it more probable that a jury would credit the wife's testimony explaining her reliance on a fabricated alibi and her delay in reporting her knowledge of the victim's murder to the police; moreover, the probative value of the domestic abuse testimony was not outweighed by unfair prejudice to the defendant because it provided a context and reasonable explanation for the jury to consider the actions of his wife, and the court made efforts to limit the risk of unfair prejudice by admitting her description of incidents that occurred at around the same point in time as the victim's murder, and limiting the testimony about incidents at other points in time by ordering that she not go into detail about them.

3. The defendant's claim that he was deprived of his due process right to a fair trial as a result of prosecutorial improprieties was unavailing: certain challenged questions of the prosecutor were not intended to elicit inadmissible responses from the defendant's wife, as they were broad and open-ended, the defendant's wife appeared to offer her responses spontaneously and without prompting, and the prosecutor did not go into further detail about certain incidents, but instead directly acknowledged to the trial court that the state would limit its inquiries to the specific matters that the court had allowed in its order; moreover, the prosecutor's references during rebuttal closing argument to specific instances of domestic violence to which the defendant's wife had testified were not improper, as the prosecutor relied exclusively on evidence admitted during the trial in making her argument that the defendant and his wife had an abusive relationship, the defendant's unpreserved claim that the prosecutor improperly failed to redact certain portions of the statement of the defendant's wife to the police was evidentiary in nature and not reviewable, and the defendant having failed to establish any prosecutorial improprieties, it was not necessary to address his claim that this court should exercise its supervisory authority to award him a new trial.

Argued October 16, 2018—officially released January 22, 2019

*Procedural History*

Substitute information charging the defendant with the crimes of murder and felony murder, brought to the Superior Court in the judicial district of Waterbury, and tried to the jury before *K. Murphy, J.*; verdict and judgment of guilty of murder, from which the defendant appealed. *Affirmed.*

*Katherine C. Essington*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom were *Cynthia S. Serafini*, senior assistant state's attorney, and, on the brief, *Maureen Platt*, state's attorney, and *Donald F. Therkildsen, Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEAR, J. The defendant, Victor Santiago, appeals from the judgment of conviction, rendered against him after a jury trial on the charge of murder in violation of General Statutes § 53a-54a. On appeal, the defendant claims that the trial court erred in admitting into evidence (1) his wife's statement to the police as a prior consistent statement and (2) her testimony of uncharged misconduct relating to domestic violence perpetrated by the defendant. Additionally, the defendant claims that the prosecutor's alleged violations of the court's order limiting the scope of uncharged misconduct evidence constituted prosecutorial impropriety that deprived him of his due process right to a fair trial. Alternatively, the defendant claims that the alleged prosecutorial impropriety warrants the exercise of this court's supervisory authority to award him a new trial, based on similar conduct by the prosecutor in at least one other trial. We affirm the judgment of conviction.

The jury reasonably could have found the following facts from the evidence presented at trial.[1] In the early morning hours of April 11, 1998, Wilfred Morales was shot and killed near his home on Middle Street in Waterbury when he was returning there from a bar he owned on Baldwin Street. Morales' murder remained unsolved for twelve years, until the defendant's estranged wife, Damaris Algarin-Santiago (Algarin), provided the police with a written statement implicating the defendant and his brothers, Thomas Bonilla and Noel Bermudez, in the crime.

Algarin was the state's chief witness in its prosecution of the defendant. She and the defendant had been in a relationship from 1993 until 2008, had married in 2004 so that she would not be able to testify against him concerning Morales' murder, and had four children together. During Algarin's relationship with the defendant, he was extremely abusive toward her and, as a result of this abuse, she had come to fear him.

On April 10, 1998, Bonilla was released from prison. The defendant, Bonilla, and Bermudez went out that night to celebrate Bonilla's release, while Algarin stayed home and later went to sleep. At approximately 3 a.m. on April 11, 1998, Algarin was awakened by the defendant and told to go downstairs. Upon entering the downstairs living room, she saw the defendant and Bonilla sorting cash and checks on the coffee table. She also saw a blue leather bank bag. Bermudez was in the kitchen disassembling guns, and Bonilla threatened to kill her if she said anything about what she was seeing or hearing. Bermudez then told her that he had shot Morales because he thought Morales had a gun and because Morales had previously shot the defendant.

The defendant and his brothers proceeded to destroy the evidence. They wiped the guns with baby oil as they

broke them down and placed them into bags. They also burned the checks in the kitchen sink and burned the bank bag and their clothes in a container in the back of the house. Bonilla and Bermudez then went to a car wash to clean any gun residue from the vehicle they had used that night and, after they returned from the car wash, the defendant took Algarin to dispose of the guns which were placed in three separate bags. While they were disposing of the guns, Algarin asked the defendant about the murder. He told her that he had been stalking Morales and planning to rob him because he knew that Morales always carried cash on him at the end of the night, that Bermudez and Bonilla had waited in the bushes for Morales while he waited in the car, and that Bermudez had shot Morales.

When they returned to the house, the defendant and his brothers formulated an alibi. This alibi was that they were all together at their mother's house celebrating Bonilla's release from prison and sharing a Good Friday meal. Algarin stuck to this story for the next twelve years, despite repeated questioning by the Waterbury police. In 2009, however, Algarin began dating Luis Maldonado, whom she told about Morales' murder. In April, 2010, when Maldonado had some legal trouble of his own, he told the police what Algarin had told him about Morales' murder. When confronted by the police, Algarin finally admitted that the defendant and his brothers had killed Morales, and she provided the police with a written statement detailing everything she knew about the murder.

The state thereafter charged the defendant with murder, in violation of § 53a-54a (a), and felony murder, in violation of General Statutes § 53a-54c. The jury found the defendant guilty of murder and not guilty of felony murder, and the court sentenced the defendant to sixty years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant claims that the trial court erred in admitting Algarin's 2010 written statement to the police into evidence as a prior consistent statement. We conclude that the court did not abuse its discretion in admitting Algarin's written statement to the police, as redacted, into evidence for that purpose.

The following additional facts are relevant to this claim. On direct examination, Algarin testified that on April 9, 2010, she provided the written statement about the 1998 murder to the Waterbury Police Department. After reviewing the statement to refresh her recollection, Algarin described in detail the events of April 10 and 11, 1998, including statements that the defendant had made to her regarding how the incident occurred, the creation of the alibi, and the depositing of the money that had been stolen from Morales. Algarin testified that

she had been questioned by police about the murder three or four times prior to providing them with her 2010 written statement, and that on each occasion she had made statements supporting the alibi created by the defendant and his brothers. Algarin also testified that, in the years following Morales' murder, she had told only three people about the murder: Ralph Crozier, an attorney whom she told in 2002; her former coworker; and Maldonado, whom she told in 2009. She stated that she had made the written statement to the police in 2010, and not sooner, because the defendant at that time was incarcerated and she felt "free to speak and free to live." Additionally, Algarin testified that she had been aware of a $50,000 reward that had been offered for information as to Morales' murder on the previous occasions when she had been asked by the police about the incident, but that she did not provide the police with any information prior to 2010. She stated, however, that she subsequently received, in 2010, approximately $28,000 of the reward for providing the information to the police.

Defense counsel's cross-examination included questions regarding Algarin's motive for making the statement in 2010. Specifically, defense counsel asked Algarin if, prior to her 2010 statement, she had spoken to the police three or four times about Morales' murder. Algarin admitted that on each occasion she had spoken to police prior to 2010, she had told them a story that was inconsistent with her trial testimony. Defense counsel also asked Algarin if she told the police that she needed to save Maldonado from getting hurt in jail because he had been arrested that day, and she replied in the affirmative. Algarin, however, denied that her goal in making the statement was to get Maldonado out of jail. The court subsequently asked Algarin about when she applied for the reward she received. Algarin testified that Crozier, her attorney at the time, applied for the reward some time after she gave the statement in 2010. When asked again by defense counsel as to when she received the award, Algarin testified that she did not receive the award until after she made the statement and had been relocated to another state.

The state offered Algarin's statement to the police into evidence as a prior consistent statement. Defense counsel objected on the grounds that Algarin had not been impeached by an inconsistent statement and that a suggestion of bias, interest, or motive to fabricate was present at the time Algarin made the written statement. After oral argument, the court, relying on this court's ruling in *State* v. *Rose*, 132 Conn. App. 563, 33 A.3d 765 (2011), cert. denied, 303 Conn. 934, 36 A.3d 692 (2012), decided to admit Algarin's statement to the police with certain redactions. The court permitted the state to read the redacted statement to the jury. Prior to the reading of the statement, the court provided the jury with a limiting instruction, stating that the purpose of its intro-

duction was to show its consistency with Algarin's in-court testimony and that the jury should consider the statement only as it related to her credibility and not as substantive evidence.

On appeal, the defendant claims that Algarin's statement was not admissible as a prior consistent statement because she did not make the statement prior to when her bias, interest, or motive to fabricate arose. Specifically, the defendant argues that Algarin's motive to give the statement arose (1) when Maldonado was arrested and incarcerated, and she became concerned for his safety in jail, and (2) in the years before the statement was made when she became aware of the $50,000 reward being offered for information about the 1998 murder.

We first set forth the applicable standard of review. "To the extent [that] a trial court's admission of evidence is based on an interpretation of the Code of Evidence, our standard of review is plenary. For example, whether a challenged statement properly may be classified as hearsay and whether a hearsay exception properly is identified are legal questions demanding plenary review. . . . We review the trial court's decision to admit evidence, if premised on a correct view of the law, however, for an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Griswold*, 160 Conn. App. 528, 536, 127 A.3d 189, cert. denied, 320 Conn. 907, 128 A.3d 952 (2015). As such, "evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. . . . This deferential standard is applicable to evidentiary questions involving hearsay, generally . . . *and to questions relating to prior consistent statements, specifically.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Henry D.*, 173 Conn. App. 265, 274, 163 A.3d 642, cert. denied, 326 Conn. 912, 166 A.3d 635 (2017).

"The general rule is that a party cannot strengthen the testimony of his own witness by showing that he has made previous statements to the same effect as his testimony . . . ." (Internal quotation marks omitted.) *State* v. *McCarthy*, 179 Conn. 1, 18, 425 A.2d 924 (1979); *State* v. *Albino*, 130 Conn. App. 745, 773, 24 A.3d 602 (2011) ("[e]vidence that bolsters a witness' credibility before it has come under attack is prohibited" [internal quotation marks omitted]), aff'd, 312 Conn. 763, 97 A.3d 478 (2014). "Although the general rule is that prior consistent statements of a witness are inadmissible, we have recognized exceptions in certain circumstances. . . . Section 6-11 (b) of the Connecticut Code of Evidence sets forth three limited situations in which the prior consistent statement of a witness is admissible: If the credibility of a witness is impeached by (1) a prior inconsistent statement of the witness, (2) a suggestion of bias, interest or improper motive that was

not present at the time the witness made the prior consistent statement, or (3) a suggestion of recent contrivance . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Henry D.*, supra, 173 Conn. App. 275. The commentary to § 6-11 (b) further indicates in relevant part that "[c]ommon law permits the use of a witness' prior statement consistent with the witness' in-court testimony to rehabilitate the witness' credibility after it has been impeached . . . ." Conn. Code Evid. § 6-11 (b), commentary.

In the present case, defense counsel questioned Algarin on cross-examination regarding her 2010 statement to the police. Indeed, the defendant stated in his brief to this court that the "main focus in cross-examination was to suggest that Algarin made up the story about her husband and his brothers' involvement in the murder because she was concerned about Maldonado's safety in jail and wanted to get favorable treatment for him in his criminal case." Defense counsel also questioned Algarin regarding the reward for which she applied, and suggested that she may have fabricated her testimony in order to qualify for the reward.

The defendant asserts that the trial court's reliance on *State* v. *Rose*, supra, 132 Conn. App. 563, was misplaced, and distinguishes that decision from the present case by arguing that Algarin's motive to lie about the defendant's involvement in Morales' murder arose at the time of Maldonado's arrest, which was prior to her providing her written statement to the police. Therefore, the defendant claims, because Maldonado was already arrested prior to Algarin providing her statement to police, her alleged motive to fabricate in order to secure Maldonado's safety from the defendant, who was also incarcerated, existed at the time she made the statement.

Additionally, the defendant asserts that Algarin's purported motive to fabricate arose when she became aware of the $50,000 reward for information regarding Morales' murder, several years before she gave her 2010 statement to the police. Algarin testified that she was aware of the reward prior to 2010, when she was questioned by the police about the night of Morales' murder. Algarin's motive to fabricate for the purposes of obtaining the reward, thus, existed well before she provided her 2010 statement. Although Algarin testified during cross-examination and subsequent questioning by the court that she did not apply for or receive the reward until after she provided the statement in 2010, we find this timing to be immaterial. For purposes of the application of § 6-11 (b) (2) of the Connecticut Code of Evidence, what matters is when she became aware of the reward. Accordingly, we conclude that Algarin's 2010 written statement to police was not properly admitted as an exhibit pursuant to the § 6-11 (b) (2) exception requiring that the credibility of a witness

first be impeached by a suggestion of bias, interest, or improper motive that was not present at the time the witness made the prior consistent statement before the consistent statement can be admitted as an exhibit.

Although we conclude that the court did not properly admit Algarin's 2010 statement as a prior consistent statement under § 6-11 (b) (2) of the Connecticut Code of Evidence, we conclude that the statement was admissible under the § 6-11 (b) (1) exception requiring that the credibility of a witness first be impeached by an inconsistent statement of the witness before the consistent statement can be admitted as an exhibit. We may affirm an erroneous evidentiary ruling if the evidence is admissible on other grounds. See *State* v. *Vines*, 71 Conn. App. 359, 366–67, 801 A.2d 918 ("even if the trial court did not engage in the proper inquiry as to the admissibility of evidence, we are mindful of our authority to affirm a judgment of a trial court on a dispositive alternate ground for which there is support in the trial court record" [internal quotation marks omitted]), cert. denied, 261 Conn. 939, 808 A.2d 1134 (2002). "Under appropriate circumstances, a prior statement, consistent with a witness' testimony, may be admitted after introduction of an inconsistent statement. . . . There is an important qualification appended to this rule: When a prior consistent statement is received . . . under the principle we have applied, it is admitted to affect credibility only, not to establish the truth of the statement." (Citations omitted; internal quotation marks omitted.) *State* v. *McCarthy*, supra, 179 Conn. 18.

In the present case, Algarin's 2010 written statement was admitted after her credibility had been challenged during cross-examination. Defense counsel challenged Algarin's credibility by questioning her regarding how many times she had given the same alibi to police before deciding to come forward with different information in 2010. Defense counsel's reference to the inconsistencies between her testimony and the information she provided to police three or four times prior to her 2010 statement warranted, in the discretion of the court, the introduction of her prior consistent written statement to rehabilitate her credibility. See id., 18–21; *State* v. *Talton*, 63 Conn. App. 851, 855, 859–60, 779 A.2d 166, cert. denied, 258 Conn. 907, 782 A.2d 1250 (2001). The court ruled that the statement was admissible not for the truth of the matters set forth in it, but solely for the jury to assess Algarin's credibility. See *Marsh* v. *Washburn*, 11 Conn. App. 447, 462, 528 A.2d 382 (1987) ("A trial court, in its discretion, may admit a prior consistent statement to rehabilitate a witness impeached on the basis of his own prior inconsistent statements. . . . It is incumbent upon the trial court, however, to instruct the jury that such statement is to be considered solely on the issue of the witness' credibility." [Citations omitted.]).

Applying the standard that "evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice," and noting that such standard is applicable to "questions relating to prior consistent statements, specifically"; (internal quotation marks omitted) *State* v. *Henry D.*, supra, 173 Conn. App. 274; we conclude that the court did not abuse its discretion in admitting Algarin's 2010 written statement as a prior consistent statement following cross-examination exposing the lies contained in her prior inconsistent statements to the police.

## II

The defendant next claims that the trial court erred in admitting Algarin's testimony of uncharged misconduct involving specific instances of domestic violence perpetrated by the defendant against her. Specifically, the defendant argues that evidence of his uncharged misconduct was not relevant to this case and that, even if it was relevant, it should not have been admitted because it was more prejudicial than probative.

The following additional facts are relevant to this claim. Prior to trial, the defendant filed a motion in limine, arguing that his prior uncharged conduct involving domestic violence was not relevant and that its probative value was outweighed by its prejudicial effect. The state filed an opposition to the motion in limine, arguing that the defendant's motion was without merit because it mistakenly claimed that the uncharged conduct evidence was being offered to show guilt by association.[2] During direct examination, Algarin testified that her relationship with the defendant was "extremely abusive . . . [p]hysically, psychologically, emotionally, financially." As to the defendant's physical abuse, Algarin testified that "he pistol-whipped, he stabbed me, broke my nose." After describing the specific instances in which the defendant broke her nose and pistol-whipped her, Algarin testified that the abuse began early in their relationship, and occurred every day. She further testified that when she called the police to report an act of abuse, the defendant "hit [her] over the head with the phone."

Algarin also testified that the defendant always made threats against her and her family and that she did not report her knowledge about Morales' murder to the police prior to 2010 because "[t]here was always someone around from his family," which concerned her "[b]ecause they're dangerous people." Specifically, Algarin stated that the defendant and one of his brothers were in a gang called the Latin Kings and that another brother was in a gang referred to as "NETA."

Immediately following Algarin's direct examination, the court instructed the jury on its use of the prior misconduct evidence. The court stated that such evi-

dence was "not admitted to prove the bad character, propensity, or criminal tendencies of the defendant," but rather, was "admitted solely to show and establish fear on the part of the witness and one of the reasons for not reporting her observations of April 11, 1998." The court further stated that the jury "may consider such evidence if [it] believe[s] it and further find[s] that it logically and rationally and conclusively supports the issue, but only as it may bear on the issue of fear on the part of the witness, as being one of the reasons [for] her not reporting her observations of April 11, 1998." The court later repeated this same instruction in its final charge to the jury.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . All that is required is that the evidence tend to support a relevant fact *even to a slight degree*, so long as it is not prejudicial or merely cumulative." (Emphasis in original; internal quotation marks omitted.) *State* v. *Small*, 180 Conn. App. 674, 683, 184 A.3d 816, cert. denied, 328 Conn. 938, 184 A.3d 268 (2018).

Section 4-3 of the Connecticut Code of Evidence provides in relevant part that "[r]elevant evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice . . . ." "[Our Supreme Court] has previously enumerated situations in which the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the jury's emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it. . . . Furthermore, with respect to a trial court's ruling on a prejudicial-probative balancing test, [w]e will indulge in every reasonable presumption in favor of the trial court's ruling." (Citation omitted; internal quotation marks omitted.) *State* v. *Estrella J.C.*, 169 Conn. App. 56, 99, 148 A.3d 594 (2016).

Evidence of prior misconduct is generally not admissible to prove bad character or a propensity to engage in criminal activities. Conn. Code. Evid. § 4-5 (a). Section 4-5 (c) of the Connecticut Code of Evidence, however, provides that "[e]vidence of other crimes, wrongs or acts of a person is admissible for purposes other than those specified in subsection (a) [of § 4-5], such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowl-

edge, a system of criminal activity, or an element of the crime, *or to corroborate crucial prosecution testimony.*" (Emphasis added.) In determining the admissibility of prior bad acts to corroborate crucial prosecution testimony, our Supreme Court has "required the proponent of the evidence to demonstrate a close relationship between the proffered evidence and the evidence to be corroborated. Other crimes evidence, therefore, is only admissible for corroborative purposes, if the corroboration is direct and the matter corroborated is significant. . . . Under this test, significant evidence is defined as important, as opposed to trivial, evidence. . . . Direct corroborating evidence is that which is not wholly disconnected, remote, or collateral to the matter corroborated. . . . The requirement that the corroborating evidence be direct is necessary in order to ensure that the link between the corroborative evidence and the facts to be inferred therefrom is not too attenuated or nonprobative; otherwise, the evidence might unfairly reflect upon the defendant's propensity to commit crimes." (Citations omitted; internal quotation marks omitted.) *State* v. *Mooney*, 218 Conn. 85, 129, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).[3]

The commentary to § 4-5 (c) of the Connecticut Code of Evidence further provides in relevant part that "the purposes enumerated in subsection (c) for which other crimes, wrongs or acts evidence may be admitted are intended to be illustrative rather than exhaustive. Neither subsection (a) nor subsection (c) precludes a court from recognizing other appropriate purposes for which other crimes, wrongs or acts evidence may be admitted, provided the evidence is not introduced to prove a person's bad character or criminal tendencies, and the probative value of its admission is not outweighed by any of the Section 4-3 balancing factors." As such, evidence of prior bad acts has also been admitted to rehabilitate a state's key witness. See *State* v. *Estrella J.C.*, supra, 169 Conn. App. 96–98.[4]

"The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Small*, supra, 180 Conn. App. 683.

In the present case, the evidence of the uncharged misconduct was probative to explain why Algarin feared the defendant and waited twelve years before telling the police about her knowledge of Morales' murder. The state argued that admitting evidence of severe domestic abuse was material to corroborating crucial prosecution testimony. In its ruling admitting such evidence, the court relied on *State* v. *Yusuf*, 70 Conn. App. 594, 800 A.2d 590, cert. denied, 261 Conn. 921, 806 A.2d

1064 (2002), noting "that a delay in disclosing is a significant event that the state must have some type of explanation for. So it's an important—it's extremely important if the state has any explanation for a delay in reporting."

The defendant argues that the relevance of Algarin's domestic violence testimony was contingent on the state calling Dr. Evan Stark, an expert on battered woman syndrome. The defendant, therefore, asserts that the court's reliance on *Yusuf* in its ruling was misplaced because, unlike in *Yusuf*, there was no testimony in the present case about battered woman syndrome. This court's ruling in *Yusuf*, however, does not require expert testimony about battered woman syndrome as a predicate to admitting evidence concerning domestic violence. Rather, in *Yusuf*, this court found that such testimony was relevant where it served to corroborate crucial prosecution testimony. See id., 608–609. In the present case, by parallel logic, Algarin's domestic violence testimony served to explain her reason for not providing, over an approximately twelve year period, her knowledge about Morales' murder. Because Algarin's testimony about the domestic violence directed against her made it more probable that a jury would credit her testimony explaining her reliance on the fabricated alibi and her delay in reporting her knowledge to the police, we conclude that the court did not abuse its discretion in determining that the testimony was relevant.

We also conclude that the court did not abuse its discretion in finding that the probative value of Algarin's domestic abuse testimony was not outweighed by unfair prejudice to the defendant. In the present case, the probative value of Algarin's testimony regarding the uncharged misconduct was strong because it assisted the jury in understanding why she repeated the fabricated alibi to the police and did not disclose information to the police pertaining to Morales' murder for approximately twelve years. Algarin's testimony that she feared the defendant and, thus, did not feel safe offering information on Morales' murder to police, provided a context and reasonable explanation for the jury to consider her actions. Moreover, the court made efforts to limit the risk of unfair prejudice to the defendant. The court admitted Algarin's description of the broken nose incident and the pistol-whipping because they occurred at around the same time as Morales' murder. The court also limited Algarin's testimony about a number of other incidents of violence over the years, ordering that she not go into detail about them. We, therefore, are not persuaded that the court abused its discretion in admitting Algarin's testimony, as limited, concerning the incidents of domestic violence, in order to explain to the jury the approximately twelve year delay in her disclosure to the police of her knowledge of the murder of Morales.

### III

Finally, the defendant claims that the prosecutor repeatedly violated the court's order concerning evidence of specific instances of domestic violence and, thus, deprived him of his due process right to a fair trial. In particular, the defendant claims that the prosecutor improperly (1) elicited inadmissible responses from Algarin during direct examination, which she later referred to in her rebuttal closing argument, (2) failed to redact Algarin's statement to the police as the court had ordered, and (3) referred to several inadmissible domestic violence incidents in her rebuttal closing argument.

The defendant concedes that he failed to properly preserve these claims at trial. "It is well established law . . . that a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Franklin*, 175 Conn. App. 22, 48, 166 A.3d 24, cert. denied, 327 Conn. 961, 172 A.3d 801 (2017). This rule, however, "does not pertain to mere evidentiary claims masquerading as constitutional violations." (Internal quotation marks omitted.) *State* v. *Small*, supra, 180 Conn. App. 687.

"The principles governing our review of the defendant's claims are well established. In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, *if an impropriety exists*, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Emphasis added; internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 541–42, 180 A.3d 882 (2018). Moreover, "[w]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show . . . that the remarks were improper . . . ." (Internal quotation marks omitted.) *State* v. *Turner*, 181 Conn. App. 535, 557, 187 A.3d 454, cert. granted, 330 Conn. 909, 193 A.3d 48 (2018).

### A

The defendant first claims that "it can reasonably be inferred that the prosecutor, partly based on her particular track record, did not intend to comply with the judge's ruling limiting [Algarin's] testimony about

specific claimed instances of domestic violence"[5] because, even after the court's ruling, the prosecutor asked questions on direct examination that she should have known would elicit inadmissible responses from Algarin. (Footnote omitted.) The defendant identifies two exchanges that allegedly support his position:

"[The Prosecutor]: And when you said that [the relationship] was physically abusive, what do you mean?

"[Algarin]: Well, he pistol-whipped, he stabbed me, broke my nose.

* * *

"[The Prosecutor]: And was there abuse prior to you living with [the defendant]?

"[Algarin]: Yeah. He pulled my hair."

The defendant objected to the first exchange, and the court ruled that it did not violate its previous order on the admissibility of specific instances of domestic violence. In particular, the court stated: "[The response] came out as sort of a full stream. . . . I didn't think it violated my previous order in this regard. . . . I did indicate pistol-whipping was fine, broken nose was fine, I did not write down stabbing as an—an option. . . . It certainly is relevant for reasons I mentioned before. I will provide a limiting instruction, I guess, at this time."

The court then asked the prosecution whether it was going to go into specific details on the stabbing. The prosecutor replied that she was only going to ask about details of the broken nose and pistol-whipping incidents, pursuant to the court's order. The defendant did not object to the second exchange.

We cannot conclude on the basis of the record before us that the prosecutor's questions were intended to elicit inadmissible responses from Algarin. The prosecutor's questions were broad and open-ended, and Algarin appeared to the court to offer her responses spontaneously and without prompting. Additionally, the prosecutor did not go into further detail about the stabbing or hair pulling incidents but, instead, directly acknowledged to the court that the state would limit its inquiries to the specific matters that the court had allowed in its order.

B

The defendant next claims that the prosecutor's failure to redact references in the 2010 statement, to the defendant stabbing Algarin and beating her while she was pregnant, rose to the level of impropriety. The record, however, reveals that the defendant had the opportunity to request the court to order additional redactions of the 2010 statement. Specifically, when discussing redactions to the statement with both parties, the court asked whether there was "anything else in the statement that is not consistent with the [c]ourt's

ruling that this is admissible under [*Rose*]?" The defendant did not respond that the references to the defendant stabbing Algarin and beating her while she was pregnant should be redacted. The defendant did not subsequently object to the statement as redacted or request further redactions of the portions of the statement that he alleges on appeal should also have been redacted.

The defendant's claim that the prosecutor improperly failed to redact certain portions of Algarin's statement is purely evidentiary. "[A] defendant may not transform an unpreserved evidentiary claim into one of prosecutorial impropriety to obtain review of that claim . . . ." (Internal quotation marks omitted.) *State* v. *Devito*, 159 Conn. App. 560, 574, 124 A.3d 14, cert. denied, 319 Conn. 947, 125 A.3d 1012 (2015). Accordingly, we decline to review this unpreserved evidentiary claim.

C

Finally, the defendant claims that the prosecutor improperly referred to several inadmissible incidents of alleged domestic violence in her rebuttal closing argument and that such references were intended to arouse the passions and sympathies of the jurors. In particular, the defendant takes issue with the prosecutor's following statement: "How did she describe the relationship? Abuse was breakfast, lunch, and dinner. It was physical, emotional, financial, psychological abuse. Burned her with cigarettes, stabbed her, punched her, kicked her. She learned that if you screamed you'd only get hit more and harder. So she learned how not to scream. He would lie on top of her, she said during this abuse, and say, I own you. Pistol-whipped her, he said that was for—that he needed money for his addiction she wouldn't give it to him so he pistol-whipped her.

\* \* \*

"He didn't recall stabbing her in the leg, not that it didn't happen. If someone stabbed you do you think that that would [be] memorable to you? It was to [Algarin]."

We have previously recognized that "prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case.

[The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury [has] no right to consider." (Internal quotation marks omitted.) *State* v. *Reddick*, 174 Conn. App. 536, 559, 166 A.3d 754, cert. denied, 327 Conn. 921, 171 A.3d 58 (2017), cert. denied,     U.S.    , 138 S. Ct. 1027, 200 L. Ed. 2d 285 (2018). Additionally, "[i]t is well settled that [a] prosecutor may not seek to sway the jury by unfair appeals to emotion and prejudice . . . ." (Internal quotation marks omitted.) *State* v. *Holley*, 144 Conn. App. 558, 569, 72 A.3d 1279, cert. denied, 310 Conn. 946, 80 A.3d 907 (2013).

After a careful review of the record, we cannot conclude that the prosecutor's references, during her rebuttal closing argument, to specific instances of domestic violence to which Algarin had testified, were improper. The prosecutor relied exclusively on evidence admitted during the trial in making her argument that Algarin and the defendant had an abusive relationship. Specifically, the prosecutor referenced Algarin's testimony that the defendant was "extremely abusive . . . [p]hysically, psychologically, emotionally, financially," that the defendant pistol-whipped her, stabbed her, broke her nose, and pulled her hair, and that various other instances of physical abuse occurred "every day" over the course of their relationship. The prosecutor also referenced the following exchange that occurred during Algarin's direct examination:

"[The Prosecutor]: And you indicated that there was, I think you said the abuse that you suffered was breakfast, lunch and dinner, was that during pretty much the entire relationship or how long in your relationship was that with the defendant?

"[Algarin]: The entire relationship this is, I don't know if I could show it, but I got a cigarette burn right here on the palm of my hand."

Finally, the prosecutor referenced Algarin's testimony regarding how the defendant reacted to her questions on the night of Morales' murder:

"[The Prosecutor]: And you indicated that he put a beating on you, what do you mean by that?

"[Algarin]: He started punching me on the head, until I got to the floor and he started kicking me, repeatedly.

"[The Prosecutor]: Where was he kicking you?

"[Algarin]: In my back."

The court explicitly allowed testimony describing the

broken nose incident in its ruling limiting the testimony to specific incidents of domestic violence, as it occurred close to the time of Morales' murder. See footnote 5 of this opinion. Similarly, the court admitted Algarin's testimony as to being punched and kicked because it occurred on the night of Morales' murder. Finally, although Algarin's testimony as to being burned by a cigarette was not explicitly ruled to be admissible by the court, defense counsel did not object to it at the time it was made or thereafter. The prosecutor's delineation of the defendant's abusive relationship with Algarin during her rebuttal closing argument directly related to the state's position that Algarin delayed providing information to the police for approximately twelve years because she feared the defendant. See part II of this opinion.

Because we conclude that no prosecutorial improprieties were established by the defendant, we need not engage in an analysis of the factors set forth in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)[6] to determine whether the defendant was deprived of his due process right to a fair trial. See *State* v. *Campbell*, supra, 328 Conn. 541–42. Similarly, we need not address the defendant's claim as to whether the court should exercise its supervisory authority.[7]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The facts in the present case are nearly identical to those underlying the judgment appealed from in *State* v. *Santiago*, 143 Conn. App. 26, 28–31, 66 A.3d 520 (2013). In that case, "[t]he defendant . . . was charged with murder in violation of General Statutes §§ 53a-8 and 53a-54a (a), murder in violation of § 53a-54a (a) and felony murder in violation of § 53a-54c. The jury found the defendant not guilty of murder in violation of §§ 53a-8 and 53a-54a (a). The jury found the defendant guilty of both murder in violation of § 53a-54a (a) and felony murder in violation of § 53a-54c. The court merged the conviction of murder into the conviction of felony murder and sentenced the defendant to a term of sixty years of incarceration." Id., 31.

The defendant appealed that conviction. This court invoked its supervisory authority to overturn the defendant's conviction of felony murder in violation of § 53a-54c, holding that the prosecutor's improper comments in that case, and repeated and deliberate use of improper argument in other cases, warranted reversal and a new trial. Id., 51.

[2] The court granted the motion in part, and denied it in part, from the bench after argument on July 14, 2016. See footnote 5 of this opinion.

[3] In *State* v. *Mooney*, supra, 218 Conn. 129, our Supreme Court found a witness' testimony of the defendant's prior bad acts significant because it strengthened the testimony of another critical state witness. Additionally, the court found the testimony admissible because it reinforced the testimony of the state's critical witness and linked the defendant to the ultimate facts to be proven. Id., 129–30.

[4] In *State* v. *Estrella J.C.*, supra, 169 Conn. App. 99–100, this court found that the probative value of uncharged misconduct evidence was not outweighed by its prejudicial effect where such evidence "did not tend to arouse the emotions of the jury . . . pertained to the credibility of the state's key witness, which was the essence of the state's case . . . [and] was not consumed by an inordinate amount of time, but rather was resolved quite summarily at the beginning of two days of the trial."

[5] The court ruled in relevant part: "I think that at some point the introduction of this type of evidence becomes cumulative and therefore, perhaps overly prejudicial, but I think that I will allow the state to have the witness describe the broken nose incident in 1998, which was the same time as the murder in this case, and as well as the pistol-whipping in 1998. I will not

allow the state to go into detail on the sexual assault in [1999] or struck in the head with a [twenty-five] pound weight. What I will allow the state to do is have the witness indicate that there were a number of other incidents of violence over the years without going into detail."

[6] "In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) *State* v. *Williams*, supra, 204 Conn. 540.

[7] "[W]hen prosecutorial [impropriety] is not so egregious as to implicate the defendant's right to a fair trial, an appellate court may invoke its supervisory authority to reverse a criminal conviction *when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Santiago*, 143 Conn. App. 26, 48, 66 A.3d 520 (2013). No such conduct was demonstrated by the defendant in the present case.